# **EXHIBIT B**

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

Case No. 8:25-cv-02510-WFJ-SPF

MT PRODUCTS LLC d/b/a MedTech,

Plaintiff,

v.

ALTERNATIVE CAPITAL GROUP, LLC;
SUPERFAST CAPITAL, INC.; TOP CHOICE
FINANCIAL, INC; CURE PAYMENT
RECOVERY SOLUTIONS, LLC;
SUPERVEST, INC; SV CAPITAL
MANAGEMENT, LLC; EZ ADVANCE LLC;
GABRIEL SHAMUELOV a/k/a "Matt Owens"
and "Jason Caldwell"; and Does 1–10.

## MT PRODUCT LLC d/b/a MEDTECH'S
## [PROPOSED] FIRST AMENDED COMPLAINT
## JURY TRIAL DEMANDED

Plaintiff, MT PRODUCTS, LLC d/b/a MEDTECH by and through the undersigned attorney, hereby prays to this honorable Court for relief based on the following:

## JURISDICTION AND VENUE

1.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and federal securities statutes referenced herein. The Court also has supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367(a).

2.    Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and injuries occurred here, including disbursement of funds and the filing of a Florida UCC-1 lien.

3.    This Court has personal jurisdiction over Defendants because Defendants do business directly and/or indirectly within the state of Florida. Defendants perform sales and conduct business in Florida and the acts complained of herein have taken place and will take place within this judicial district. Further, Defendants' tortious conduct has been acted upon, and felt in the state of Florida and this district such that it would be reasonable for this Court to exercise personal jurisdiction over Defendants.

## NATURE OF ACTION & EMERGENCY RELIEF REQUESTED

4.    This case challenges a coordinated MCA transaction executed through affiliated entities and a fabricated broker identity, followed by continued collections and an unauthorized Florida UCC-1.

5.    Defendants are withdrawing $2,488.63 weekly from Plaintiff's Florida operating account and are maintaining an unauthorized UCC-1 clouding title to

Plaintiff's assets.

6.    Plaintiff asserts claims for fraud/fraudulent inducement, FDUTPA (Fla.
Stat. § 501.204), Florida Civil RICO (Fla. Stat. § 772.103), civil conspiracy to
commit fraud, aiding and abetting fraud, declaratory judgment (28 U.S.C. §
2201; ch. 86, Fla. Stat.), unauthorized UCC filing & damages (Fla. Stat. §§
679.509, 679.625), negligent undertaking/supervision (in the alternative), breach
of contract, breach of the implied covenant of good faith and fair dealing, and
unjust enrichment, and alleges the defendants operated as an association-in-
fact/alter-ego enterprise.

7.    Absent immediate injunctive relief: (a) Plaintiff will miss payroll and
purchase orders tied to patient-care supply commitments; (b) Plaintiff's vendor
and customer relationships will be irreparably damaged; (c) Plaintiff's credit and
reputation will suffer harms that cannot be adequately measured or remedied by
money damages alone; and (d) Defendants will continue to leverage the lien to
coerce performance on a contract procured by fraud; (e) Plaintiff has a likelihood
of success on the merits given SuperFast's written confirmation that "Matt
Owens" was never their employee and the addendum "is fraud"; and (f) the
public interest favors halting fraudulent debt collection practices that harm small
businesses and undermine confidence in commercial lending markets.

8.    Plaintiff seeks, pending adjudication, an order (i) halting all ACH debits
and collection activity; (ii) barring use, maintenance, or reliance on the Florida
UCC-1 naming SuperFast as secured party and directing termination (or at least
non-reliance); (iii) requiring evidence preservation; (iv) prohibiting interference
with Plaintiff's vendors, banks, or credit based on the disputed agreement or lien;
(v) issuing an Order to Show Cause for a prompt preliminary-injunction hearing;
and (vi) setting a nominal Rule 65(c) bond. Plaintiff will move separately under
Fed. R. Civ. P. 65.

## PARTIES

### PLAINTIFF

9.      MT Products LLC d/b/a MedTech ("MT Products" or "MedTech") is a Florida limited liability company. Its sole member is Leandro Obenauer, domiciled in Florida.

### DEFENDANTS

10.     EZ Advance LLC ("EZ Advance") is a New York limited liability company with its principal office in Queens County, New York (Fresh Meadows). Public records list its office at 180-32 Union Turnpike, Fresh Meadows, NY 11366.

11.     Alternative Capital Group, LLC ("ACG") is, upon information and belief, a limited liability company that maintains a principal office at 85 Delancey Street, New York, NY 10002.

12.     SuperFast Capital Inc. ("SuperFast" or "SuperFast Capital) is, upon information and belief, a New York corporation  that maintains principal office at 85 Delancey Street, New York, NY 10002.

13.     Top Choice Financial, Inc. ("Top Choice") is, upon information and belief, a Delaware corporation authorized to do business in New York, with its principal office at 61 Broadway, Suite 1901, New York, NY 10006, and registered address at  1500 Broadway, Suite 2202, New York, NY 10036.

14.     Supervest, Inc. ("Supervest") is a Delaware corporation and maintains an office at 61 Broadway, Suite 1901, New York, NY 10006, and a registered address at 1500 Broadway, Suite 2202, New York, NY 10036.

15.    SV Capital Management, LLC ("SV Capital Management" or "SV Capital") is a Delaware limited liability company registered with the U.S. Securities and Exchange Commission as an investment adviser. Its principal office is 1500 Broadway, Suite 2202, New York, NY 10036.

16.    Cure Payment Recovery Solutions, LLC ("Cure" or "Cure Payment") is a New York limited liability company with its principal office in Suffolk County, New York.

17.    Gabriel Shamuelov ("Shamuelov" or "Matt Owens") is a natural person domiciled in New York. He orchestrated the origination fraud using fabricated identities while working as a principal or employee of EZ Advance.

## COLLECTIVE DEFINITIONS AND ENTERPRISE PLEADINGS

18.    "" "Super Top Defendants." For pleading clarity SuperFast Capital, Inc.; Alternative Capital Group, LLC; Top Choice Financial, Inc.; Cure Payment Recovery Solutions, LLC; Supervest, Inc.; and SV Capital Management, LLC (collectively, the "Super Top Defendants") operated as an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). This enterprise had: (a) a common purpose of generating revenue through merchant cash advance transactions; (b) ongoing organization evidenced by shared personnel (including Nicole Orme employed across multiple entities, Andrew Baldwin representing both SuperFast and ACG), common addresses (61 Broadway Suite 1901, 85 Delancey, and 1500 Broadway Suite 2202), shared communication systems (@curepayment.com email domain), and coordinated business functions; (c) systematic operational structure with EZ Advance funneling originations, SuperFast handling funding verification and UCC filings, ACG providing contract documentation, Top Choice processing ACH debits and servicing, Cure

managing merchant support and collections, and Supervest/SV Capital aggregating investor capital; and (d) longevity evidenced by the enterprise's ongoing operations across multiple merchant transactions over an extended period.

19.    Defendants' racketeering activity consists of multiple predicate acts including: (a) Mail Fraud (18 U.S.C. § 1341) - mailing demand letters that were returned as undeliverable to fabricated business addresses, creating a systematic pattern of using false addresses to evade legal process; (b) Wire Fraud (18 U.S.C. § 1343) - interstate wire communications including phone calls, emails from matt@ezadvancellc.com, and text messages containing material misrepresentations about funding availability, broker identity, and corporate authority; (c) Identity Theft (18 U.S.C. § 1028A) - Gabriel Shamuelov's creation and use of fabricated identities "Matt Owens" and "Jason Caldwell" to impersonate corporate officers and legal counsel; and (d) Computer Fraud (18 U.S.C. § 1030) - unauthorized digital signature of forged addendum documents through DocuSign system using false identities.

20.    The predicate acts constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5), demonstrated by: (a) multiple related acts committed by the same enterprise members over an extended period from February 2025 through the present; (b) continuity evidenced by the enterprise's ongoing collection activities, maintenance of fraudulent UCC liens, and systematic broker fraud enabling across multiple merchant transactions; (c) relationship between acts shown through common methods (fabricated broker identities, forged documentation, real-time coaching of merchants during verification calls), common victims (merchants seeking business funding), and common enterprise members; and (d) threat of continued activity evidenced by Defendants' refusal

to cease collections after receiving written notice of the underlying fraud, indicating the enterprise's intent to continue its fraudulent operations.

21.    Doe Defendants. The identities and citizenship of Does 1–10 (individuals or entities that participated in origination, underwriting, servicing, collections, or investor reporting for Plaintiff's transaction) are presently unknown. Plaintiff will amend to substitute their true names and, for any LLCs, identify each member and domicile upon jurisdictional discovery or Rule 7.1(a)(2) disclosures.

22.    Corporate Structure Allegations Reserved. To the extent any defendant has misidentified its corporate form (e.g., SuperFast Capital, Inc. versus SuperFast Capital LLC) or has used tradenames interchangeably, Plaintiff alleges that each such entity acted through the others as agent, alter ego, or joint venturer in the transaction described herein and reserves the right to conform the pleadings to the proof.

## FACTUAL ALLEGATIONS

## INITIAL FRAUD

23.    Plaintiff, MT Products LLC, d/b/a MedTech is a medical supplies training kit provider in the Emergency Medical Services business. In February 2025, Plaintiff MedTech through its owner Leandro Obenauer was seeking capital to expand its operations.

24.    Around that time, through an unsolicited cold call on January 30, 2025, Plaintiff was introduced to a broker identifying himself as "Matt Owens" who offered him finance solutions that seemed like a great solution to his capital issues.

25.    Through a calculated campaign of deception spanning phone calls, emails

from matt@ezadvancellc.com, and text messages, Owens methodically constructed a false identity as a Senior Finance Officer with direct authority at Defendant SuperFast Capital.

26.    Operating with sophisticated knowledge of lending terminology and SuperFast's internal processes, Owens presented what appeared to be legitimate multi-stage funding proposals, and spoke with the confidence and insider knowledge of a seasoned lending executive.

27.    What Plaintiff did not know—and could not have reasonably discovered through ordinary due diligence, was that Matt Owens was an entirely fabricated persona, meticulously crafted and deployed by Gabriel Shamuelov, and was not even employed by SuperFast.

28.    During extensive communications spanning from January 30 through February 11, 2025, Matt Owens systematically constructed an elaborate multi-stage funding proposal. He promised MT Products an immediate $75,000 advance followed by two guaranteed additional rounds: $150,000 and $300,000. Crucially, Matt Owens (which was a fake persona for Defendant Gabriel Shamuelov) represented these follow-on rounds as pre-approved and contractually secured, requiring no additional underwriting or qualification processes.

29.    Throughout this fraudulent courtship, Shamuelov demonstrated sophisticated knowledge of SuperFast's internal systems and processes that would be impossible for an external broker to possess without inside assistance or system access. Shamuelov referenced specific underwriting criteria, internal approval processes, legal department procedures, and investor relationships with the detailed familiarity of a senior employee. This insider knowledge, combined with Shamuelov's ability to navigate SuperFast's broker portal and submit

applications under false identities, show's complicity by SuperFast in
maintaining grossly inadequate security protocols which facilitated the fraud.

30.    Throughout the discussions, Shamuelov reinforced his false authority by
repeatedly referencing internal SuperFast Capital resources under his control.
He made statements including "My underwriters," "My legal counsel," "My
accounting department," "We actually like that as a lender," and "between me,
my funding manager, and the investors." These representations created the
impression that he had direct lending capability, and possessed executive-level
decision-making authority within SuperFast Capital's lending operations. There
was no indication that Matt Owens was acting just as a broker.

31.    Between January 30 and February 11, 2025, Shamuelov acting as Matt
Owens made the following material false statements to Plaintiff by phone, SMS,
and email from matt@ezadvancellc.com and numbers 786-952-6979, 347-933-
7764, and 516-689-1420: (a) Plaintiff was pre-approved for three rounds of
funding—$75,000, then $150,000, then $300,000—with no further
underwriting; (b) he had authority as a Senior Finance Officer at SuperFast to
guarantee those rounds; (c) "Jason Caldwell," purporting to be SuperFast legal
counsel, had signed the addendum; and (d) substitution of the paper to
"Alternative Capital Group" was a routine administrative matter while SuperFast
remained the operational lender and decision-maker, and (e) statements
including "My underwriters," "My legal counsel," "My accounting department,"
and "between me, my funding manager, and the investors" demonstrating false
claims of executive authority. Each statement was false and known to be false
when made. Plaintiff reasonably relied by executing the agreement.

32.    Shamuelov issued the funding addendums with SuperFast Capital's logo
on each addendum which promised the much larger sums of funding scheduled

to follow. Between February 3 and February 10, 2025, Shamuelov transmitted approximately eight versions of a forged addendum to the funding agreement via DocuSign, each bearing SuperFast Capital's official logo and formatting. See Exhibit A, Fraudulent Addendums.

33.     To enhance the legitimacy of the forged addendum, Shamuelov created a second fictitious identity, "Jason Caldwell," whom he presented as SuperFast Capital's legal counsel. The final addendum was digitally signed by "Jason Caldwell" using the same email address (matt@ezadvancellc.com) that Matt Owens used throughout all communications.

34.     The funding Addendum sent by Matt Owens were transmitted based on the understanding that he represented SuperFast Capital. It was unknown to Plaintiff that Matt Owens was an alias used by Defendant Gabriel Shamuelov.

35.     Relying on these promises, Leandro Obenauer, on behalf of MT Products LLC d/b/a MedTech, agreed to execute what was titled as a Revenue Purchase Agreement ("Agreement"), which indicated that the funding entity was Alternative Capital Group, LLC.

36.     Alternative Capital Group LLC designated as Purchaser/Funder in the Agreement, was a name Mr. Obenauer never heard of prior to signing. Plaintiff entered into the Agreement expressly because of the additional addendums guarantee of future financing – a guarantee Plaintiff believed to be legitimate at the time. Shamuelov explained this substitution of named lender as a routine administrative matter, while maintaining that SuperFast Capital remained the operational lender and decision-maker for all future funding rounds which he expressed were already approved.

37.     On or about February 11, 2025, prior to disbursement of the funding, SuperFast Capital conducted a "funding call" with Mr. Obenauer using a third-

party vendor to verify that the merchant understands the terms of the agreement. During this critical verification call, the third-party representative asked Plaintiff whether he had been promised any additional rounds of funding beyond the immediate $75,000 advance.

38.    Under explicit real-time coaching from Shamuelov acting as Matt Owens, Plaintiff answered "no" to this verification question. Shamuelov specifically instructed Plaintiff: "The accountant is really good and will just be asking the standard question. I spoke to the accountant and she is not aware of the additional funding. I don't want to confuse the accountant from what is funding today because they have a certain number in the screen. Any mention of the additional funding may prolong things." This real-time coaching constituted deliberate subversion of SuperFast's verification process and evidences the premeditated nature of the fraud scheme.

39.    Shamuelov deliberately framed this deception as routine industry practice, explaining that such information was compartmentalized within the organization and that only he, his "financing manager," and the "investor himself" were privy to the multi-stage funding arrangement.

40.    Immediately following the funding call, Plaintiff texted Shamuelov expressing concern that the representative's tone suggested he was obligated to repay full $109,500 without any guaranteed future funding. Owens reassured him that the representative was "just saying that because she needs to," and reiterated that the follow-on funding remained secured.

41.    Plaintiff received a deposit of $73,500 [of a $75,000 loan] as the initial funding round on or about February 12, 2025. Relying on the assurances provided in the Fraudulent Addendums and Shamuelov's repeated guarantees, Plaintiff commenced regular weekly payments of $2,488.63, as required under

the agreement.

42.     It was Plaintiff's understanding per the promises made by Shamuelov that following payment of 30% of the first loan's payback amount—which Plaintiff calculated to be $32,850—MedTech would be entitled, without further underwriting or reapplication, to a second round of funding in the amount of $150,000, followed by a third round of $300,000 after additional milestones.

43.     Over the following weeks, Plaintiff made timely, weekly payments under the initial agreement, tracking progress toward the 30% milestone that would trigger eligibility for the second round. As Plaintiff approached the 30% payment milestone, Plaintiff proactively contacted Owens  to confirm the status and expected timeline for the release of the promised second round.

44.     However, as the anticipated eligibility date for the second round arrived and passed (April 10-14, 2025), Leandro Obenauer made multiple unsuccessful attempts by phone, SMS, and email to contact Matt Owens regarding the release of those funds.

45.     Unlike Owens's previously prompt detailed communications during the initial funding and issuance of the Fraudulent Addendums, texts and emails went unanswered; attempted calls were ignored or diverted. Where Owens previously responded to inquiries within minutes—even after business hours—communications now exhibited marked delays or ceased entirely.

46.     By the end of April's third week, after multiple unreturned attempts at outreach and growing operational pressure due to the absence of promised capital, Plaintiff recognized a material deviation from the expectation set by the fraudulent addendum and Owens's detailed reassurances. The abrupt silence, after weeks of detailed and immediate correspondence, constituted the first unmistakable signal that the entire multi-stage funding promise may have been

fraudulent.

## FRAUD UNCOVERED

47.    After Plaintiff's repeated, unsuccessful attempts to contact "Matt Owens" regarding the promised second round of funding, including 12 unanswered phone calls, 8 unresponded text messages, and 5 ignored emails over a 10-day period from April 5-15, 2025.

48.    On April 15, 2025, Leandro Obenauer called SuperFast Capital's published merchant support line. He was routed to Elisa L., Team Leader of SuperFast's Merchant Support. When Leandro requested to speak with Matt Owens, Elisa promptly stated that there was no employee by that name at SuperFast Capital. Elisa's response was immediate and unequivocal, signaling that Matt Owens was not only absent from their staff directory but unfamiliar at the management level as well.

49.    Elisa further inquired about why Plaintiff was seeking Matt Owens. Leandro explained the circumstance regarding the multi-stage funding and Fraudulent Addendums signed via DocuSign, which had been presented as formal SuperFast Capital company documents by Mr. Owens.

50.    Elisa, upon initial review, could not locate any record of additional funding addendums attached to Plaintiff's file and expressed confusion about both the Matt Owens and the promised additional funding. But Elisa did confirm Plaintiff's $75,000 loan and funding Agreement on record.

51.    At Elisa's request, Plaintiff emailed a copy of the Fraudulent Addendums bearing SuperFast's logo and (false) internal authority signatures. Within minutes, Elisa called Plaintiff back, telling him, "I'm sorry to tell you this, but that document is not from us. That is fraud."

52.    Elisa confirmed that neither the structure, nor the names, nor the products

matched any legitimate SuperFast funding process. She further confirmed, upon Plaintiff's request for written confirmation, that no one named Matt Owens had ever been employed at SuperFast, and that the referenced Fraudulent Addendums had never been issued by their compliance or legal staff.

53.    In contrast, the following day (April 16, 2025) Plaintiff spoke with SuperFast representative Lauren, who checked company records and informed Plaintiff that the broker on file for Plaintiff's $75,000 loan was EZ Advance LLC. This was the first time the Plaintiff heard about the company named EZ Advance. According to Lauren, Matt Owens was listed throughout SuperFast's electronic records  as the EZ Advance broker who submitted Plaintiff's loan application to SuperFast Capital for funding. There was no record of a Gabriel Shamuelov in the SuperFast systems. The only contact info on file was the email signature and contact information for Matt Owens.

54.    Lauren also stated that while Matt Owens appeared as a broker in their system, she had no record of "Jason Caldwell" (the alias used for legal signoff on the forged addendum). Lauren confirmed that SuperFast processed deals through a wide network of third-party brokers and independent sales organizations ("ISO") partners—including EZ Advance—but revealed the company kept incomplete identity records and did not independently verify broker submissions for employment or licensing.

55.    At the conclusion of their conversation, Lauren stated that there was nothing she could do about the incident and that she would need to escalate the issue to management. She emphasized that the weekly payments were still due in full and they would not stop.

## DEMAND LETTERS

56.    Beginning on April 18, 2025, the Plaintiff mailed demand letters to all

involved Defendants. Each Defendant was sent a separate demand letter, outlining the allegations of fraud, the liability of each entity, and a clear chance to correct the wrongful acts committed. A copy of the demand letter was sent to a total of 14 addresses. Notably, only 4 were delivered; 10 of the letters were returned to sender by USPS with notations including "Refused," "Vacant," "Insufficient Address," and "Forward Expired," demonstrating Defendants' systematic avoidance of proper legal notice.

57.    In the Agreement, 85 Delancey St, New York, NY is provided as ACG's (Alternative Capital Group) address for all notices to be mailed to. Plaintiff sent demand letters to ACG at 85 Delancey. All of the letters were returned to Plaintiff marked "return to sender," making it impossible for the Plaintiff to effectively communicate with ACG about the fraud or any terms of the Agreement.

58.    The Plaintiff also sent mail to Top Choice which was returned to sender. Plaintiff then utilized a process server in an attempt to reach Top Choice after mail sent by USPS was returned to sender. Prior to service, Plaintiff called Top Choice and spoke to an employee by the name of Nicole who confirmed Top Choice's mailing and physical address as 61 Broadway, room 1901, New York, NY 10006. Service at this address was subsequently attempted and failed. According to security of the building, Top Choice Financial was not listed at the address or in any unit in the building.

59.    On April 24, 2025, Andrew Baldwin responded via email on behalf of both SuperFast Capital and ACG, acknowledging receipt of Plaintiff demand letter. In his response, Baldwin admitted that EZ Advance fabricated non-existent future funding options but deflected liability.

60.    In the email Baldwin attempted to shift the blame of the fraudulent events

entirely onto the Plaintiff, stating he was not truthful on the funding call.

61.    Conditional rescission  and return of the disbursed principal minus payments already made was offered, contingent on full repayment by end of business on April 30, 2025. This offer was known to be impossible months after disbursement knowing that Plaintiff would have used the funding capital on items detailed in the loan application.

62.    Baldwin threatened that any interference with their collections would constitute an "Event of Default," triggering legal action. Notably, Baldwin signed off the email with, "SuperFast / Alternative Capital Group LLC."

63.    Plaintiff responded formally on April 28, 2025, challenging the legal and factual premises of Baldwin's letter. The response clearly asserted that Mr. Obanuer's recorded statements were made under real-time coaching by Gabriel Shamuelov ("Matt Owens") and that SuperFast's system enabled the fraud by failing to verify the broker's identity.

64.    Plaintiff further emphasized that SuperFast's continued collections and lien enforcement after receiving actual notice of the fraud was improper. Further, the response requested immediate clarification of Baldwin's capacity, which entity he represented, and the relationship between ACG and SuperFast. No communication was received from Mr. Baldwin after this request.

65.    No other Defendants responded to Plaintiff's demand letters.

66.    Following these confirmations of fraud and lack of broker verification, Plaintiff undertook an investigation to understand the fraud which was perpetrated against him.


**DISCOVERY AFTER INVESTIGATION**

67.     Early in the investigation Plaintiff realized that EZ Advance LLC had no online footprint and could only be confirmed by their website. Immediately it was apparent that  EZ Advance's website was a copy of another company's website. Specifically, EZ Advance copied Rapid Finance's website (who is a legitimate funder).[1] Rapid Finance's marks, images, and text even remained on EZ Advance's website through today.

68.     Plaintiff also revisited communications with SuperFast employees Lauren and Elisa. He confirmed that Lauren and Elisa's email accounts bore the domain "curepayment.com." Elisa and Lauren are also listed as employees of Cure Payment Recovery Solutions LLC on LinkedIn.

69.     Plaintiff then began reaching out to employees of SuperFast to better understand how this fraud occurred. In May of 2025, Mr. Obenauer received a text message from an individual by the name of Nicole Orme whom he later had conversations with.

70.     Nicole confirmed that she worked for Top Choice and Supervest at different capacities. Nicole asked Obenauer from the onset of the conversations whether he was putting together a RICO investigation. Mr. Obenauer found this to be odd because he never mentioned anything about RICO, and was unaware of what "RICO" was outside of Nicole mentioning the term. The demand letters also did not mention anything about "RICO."

71.     Nicole expressed that she was personally aware of Plaintiff's case and that all of the principles at Supervest, Top Choice, ACG, and Superfast have met to discuss Plaintiff's demand letters and accusations of fraud. Nicole informed Obenauer that she personally knew Andrew Baldwin and that the Super Top

---

[1] www.rapidfinance.com

Defendants each discussed and approved his response to Plaintiff before Baldwin emailed Plaintiff on April 24, 2025.

72.    Nicole confirmed the operational structure of the entities in that Supervest raised the funds through individual investors which was the source of the loan Plaintiff, ACG was not a real entity but just on paper for protection, Top Choice processed the payments, and Superfast was the marketing face.

73.    During the conversations Nicole had with Obenauer, she told him that Supervest clawed back commissions paid to EZ Advance after hearing about the fraud. This claw back was for approximately $7,500-$10,000. Plaintiff never received a credit for the clawed back commissions.

## GABRIEL SHAMUELOV DISCOVERED TO BE THE REAL IDENTITY OF "MATT OWENS"

74.    Mr. Obenauer began analyzing additional communication records from the fraudulent transactions. The investigation revealed that Matt Owens used multiple phone numbers during the scheme: initially contacting MedTech through phone no. 786-952-6979, conducting primary negotiations through phone no. 347-933-7764, and attempting post-discovery contact via phone no. 516-689-1420.

75.    Through Detective Thomas Kauffman of the Leesburg, Florida Police Department, who conducted an official investigation into the fraudulent acts perpetrated against MedTech and Mr. Obenauer, it was established that all phone and email records associated with the Matt Owens fraud traced directly to Defendant Gabriel Shamuelov including one phone number registered to Gabriel's mother Pinkos Shamuelov at the same 6538 Booth St, #4D address.

76.    The investigation into Gabriel Shamuelov's identity and operations revealed a deeply sophisticated fraud network that extended far beyond simple

impersonation. Through Detective Kauffman's investigation and Plaintiff's
private investigations, it became clear that Shamuelov and the Super Top
Defendants had created a multi-layered identity scheme designed to
systematically defraud businesses seeking capital funding.

## FRAUD TO PROFITS PIPELINE

77.    From the outset, the transaction that injured Plaintiff did not move through
independent companies acting at arm's length.

78.    At the mouth of that pipeline sat EZ Advance LLC, the origination front
used by Gabriel Shamuelov while posing as Matt Owens. EZ Advance acted as
the enterprise's broker funnel. SuperFast admitted that EZ Advance was the
broker of record, and that Matt Owens was listed all through their system as the
broker that presented loan files.

79.    SuperFast, though somewhat absent from the signed agreement, they were
the front-facing entity dealing with the broker and merchant. In the agreement
ACG (Alternative Capital Group) is referenced as "SFC" by abbreviation which
would match shorthand for SuperFast Capital. Additionally, the contact email
for          servicing          the          agreement          is          listed          as
superfastmerchantsupport@curepayment.com.

80.    Top Choice, who was designated in the agreement as the "Authorized
Sub-Servicing Agent," performs the ACH debits. All the scheduled weekly
payments debited from MedTech's accounts to date list Top Choice Financial
LLC on MedTech's banks statements.

81.    Cure operates as merchant support and collections for SuperFast/ACG.
Upon default Cure's merchant support turned to enforcement and debt
collections. Mr. Obenauer's original email complaints were sent to email address
superfastmerchantsupport@curepayment.com, which were then responded to by

Elisa and Lauren representing Superfast and ACG.

82.    Supervest/SV Capital provides investor capital and syndication for MCA deals originated through SuperFast/ACG. The agreement lists admin@supervestcap.com as the contact email to request reductions in monthly payments.

83.    The result was a single enterprise operating under several names: EZ Advance originated the fraud; ACG provided enterprise protection on paper; SuperFast filed and enforced the lien and fronted brand communications; Top Choice processed and debited under "authorized agent" status; Cure managed merchant contact and compliance messaging; Supervest syndicated investor capital and supplied the funds. Each depended on the others to make this transaction happen and then to keep it "performing" after the fraud was disclosed.

## Custom and Practice: Use of Aliases

84.    In May of 2025, when Mr. Obenauer spoke to Nicole Orme (employee shared by SuperFast, Supervest, and Top Choice), she communicated that it was common for brokers to use aliases when facilitating loans with their companies. It was a known fact that this alias use was allowed by the Super Top Defendants.[2]

85.    Elisa with Superfast admitted that Matt Owens was the individual broker listed on MedTech's loan as the submitter. SuperFast had no information on that Gabriel Shamuelov was the actual broker, and no indication that he was the true identity of the Matt Owens persona. Based on Nicole's admission the use of a fake persona was not only allowed by the Super Top Defendants but it was custom and practice for their enterprise's operation.

---

[2] This is the same Nicole referenced earlier in the Complaint.

86.    Nicole told Obenauer that "we do run background checks on ISOs
(brokers) and ISO owners... 110% all the time." They had no information on
Gabriel Shamuelov because brokers were allowed to use fictitious names when
brokering MCA's with their own company. This is evident by the fact that
Superfast's internal system only had Matt Owens as the broker and had no
knowledge of Gabriel Shamuelov.

87.    It is clear that the Super Top Defendants implemented due diligence
procedures that were deliberately superficial and designed to avoid detecting
obvious fraudulent activity.

### Custom and Practice: Failure in Conducting Broker Website Due Diligence

88.    While Obenauer was not aware of EZ Advance's role until after he was
informed by Elisa of Cure/SuperFast, he immediately did some due diligence on
their website after he became informed. His investigation found that the
company's web presence was deliberately crafted to mimic legitimate lending
institutions, specifically copying the design, language, and formatting of Rapid
Finance, a well-established commercial MCA lender.[3]

89.    This wasn't mere template borrowing—entire sections were replicated,
including one page where EZ Advance's website still contained the "Rapid
Finance" name and logo branding.

90.    EZ Advance's website falsely represented to be a direct lender.
Throughout the website, the company made statements such as "our team will
transfer your funds to the business banking account supplied," creating the
impression they possessed capital and lending authority.

---

[3] When Obenauer spoke to the defendants' common employee Nicole she confirmed that Rapid Finance is a
well-known and reputable funder of MCA transactions in the industry.

91.    In reality, EZ Advance operated as broker, earning commissions by submitting applications to actual funders like SuperFast Capital while concealing this relationship from borrowers.

92.    SuperFast Capital failed to conduct basic website verification that would have immediately revealed EZ Advance's fraudulent operations. A basic review of EZ Advance's website would have immediately revealed the copied content from Rapid Finance, including sections where "Rapid Finance" branding remained unchanged.

93.    Nicole explicitly confirmed that SuperFast Capital failed to conduct basic website verification when she stated: "There's a third-party guy that works within our office that does background checks on everybody." When directly asked if she had looked at EZ Advance's website "in depth," she confirmed she had not.

94.    When Mr. Obenauer confronted Nicole with the fact that EZ Advance wholesale copied their website from Rapid Finance (a reputable funder recognized by the enterprise) and that EZ Advance's webpage retained instances of Rapid's name on the page, Nicole characterized this as common custom practice for their brokers. Nicole admits' she had not looked at EZ Advance's website and was unaware of the glaring plagiarism. Nicole also admits that the enterprise did no due diligence on EZ Advance's claims of being a direct funder prior to the date of the May 2025 call with Mr. Obenauer.

95.    This admission demonstrates that SuperFast Capital's due diligence process completely ignored obvious website red flags that would have immediately revealed EZ Advance's fraudulent operations through copied content from a legitimate funder.

96.    Defendants' internal personnel responsible for broker relations—

including Nicole—acknowledged they neither performed identity checks nor independently verified broker materials. With those functions outsourced, no employee or principal decision-maker of the SuperFast, or Supervest reviewed the sensitive onboarding or verification data, and the enterprise maintained no internal controls requiring SuperFast's staff to cross-check or even be familiar with the due-diligence findings.

### Custom and Practice: Failure to Uncover Coaching in Funding Call Due Diligence

97.    In the hours preceding the February 11 funding call, Shamuelov acting as Matt Owens engaged in extensive coaching of Mr. Obenauer through voice messages and text instructions. See Exhibit B. Coaching Text Messages.

98.    Shamuelov directed Obenauer to deny any promised additional rounds, provided external callback numbers, and requested confirmation when the call concluded. This coaching was captured in text-thread screenshots and audio transcripts that demonstrate the coordinated nature of the deception. Exhibit B.

99.    Following this coaching, Mr. Obenauer answered "no" during the recorded call when asked whether additional funding rounds had been promised—a coached misrepresentation made in direct reliance on the Fraudulent Addendums (Exhibit A) and the broker's false promises and authority as a SuperFast executive.

100.   Prior to Plaintiff's transaction, Super Top Defendants had processed approximately ten (10) Matt Owens-EZ Advance deals and received multiple merchant complaints describing the same tactics—non-existent "follow-on" funding, coached verification-call answers, and misstatements about broker status and terms—yet they continued accepting EZ Advance submissions without suspending the broker, verifying identity/licensing, or implementing a

more robust funding call script.

101.  SuperFast's funding-call process was deliberately designed to be script-bound and incapable of detecting true fraud or broker coaching. The enterprise maintained no protocol for confronting brokers during verification, probing for coached responses, asking if the merchant was coached, or providing funding addendums which should have been provided (as discussed below) and which drove the merchant's decision to accept funding.

102.  Shamuelov acting as Matt Owens would not have known how to coach Plaintiff unless the Super Top Defendants revealed to him what questions would be asked on the funding call.

103.  When the fraud was later exposed, Andrew Baldwin acting on behalf of SuperFast and ACG invoked the coached funding call as a liability shield.

104.  This systematic failure to design meaningful verification procedures, despite acknowledged industry-wide broker misconduct, constituted a purposeful gap that enabled the enterprise to profit from transactions while maintaining plausible deniability. The funding call became not a protective measure for merchants, but a post-hoc justification for enforcing agreements induced through the very fraud the enterprise had failed to detect.

## SUPERVEST & TOP CHOICE ROLE IN FRAUD

105.  In the May 2025 call with Mr. Obenauer, Nicole explained that the operational lines are blurred by design. She initially identified herself as an employee of Top Choice. She then admitted that she also worked for Supervest, she also handled broker engagement for Superfast.[4] She described an organizational structure in which Supervest aggregated investor funds for deals

---

[4] Nicole informed Obenauer that an individual by the name of Joseph Vaknen managed Superfast broker relations before her, but that he passed away some time ago. Joseph was not alive when this transaction came about.

that Superfast originated, and Top Choice disbursed and serviced the loans (including the loan at issue in this matter.) Her account confirms that Supervest supplied the capital to MedTech, while Top Choice delivered and serviced the payments.

106.   Top Choice Financial lists 61 Broadway, Unit 1901, New York, NY 10006 as its business address, which is the same address and unit that Supervest identified as its business address when Plaintiff called Supervest's main line. Public records also list 1500 Broadway, Suite 2022, New York, NY 10036 as a NY DOS registered address for Top Choice and Supervest.

107.   The Agreement itself points back to Supervest in that it directs MedTech to an "@supervestcap.com" address for payment-relief requests, underscoring that investor-side controls sat with Supervest even though ACG was the on-paper issuer of funds. Unfortunately, the email is not real and bounces back when emailed. Supervestcap.com is also not an active website.

108.   In describing a single integrated operation that both raises investor money and services the loans issued, Nicole further informed Mr. Obenauer that Supervest was bound by securities-law obligations.[5]

109.   Therefore, when the fraud surfaced, Nicole explained that Supervest would not authorize complete unconditional rescission because doing so would create problems for investor reporting. She confirmed that Supervest distributes returns to individual investors and framed contract unwinding as an investor-optics issue rather than a fraud-remediation step, despite the platform's claw back of Shamuelov's commission.

---

[5] Supervest operates in the securities arena. Its affiliated adviser reports as an Exempt Reporting Adviser on the SEC's Investment Adviser Public Disclosure system and remains subject to the Advisers Act's anti-fraud provisions, including Sections 206(1)–(2) and Rule 206(4)-8. Those rules prohibit materially false statements or omissions to fund investors and require truthful, non-misleading reporting about portfolio assets.

110.   Supervest, as the capital allocator and investor-facing platform within this shared structure, continued to receive and/or direct receipt of Plaintiff's payments through Top Choice during this period.

111.   Acting as adviser and capital allocator to pooled investor vehicles, Supervest acting through SV Capital Management owed fiduciary and anti-fraud duties under the Advisers Act, including the duty to avoid deceptive omissions and to act in its clients' best interests. By failing to disclose to its investors that the receivable had been procured through forged documentation and a false identity, Supervest allowed reports and dashboards to portray the position as "performing" while material facts were withheld.

112.   Supervest's capital role, its visibility into portfolio performance, its shared personnel with Top Choice and SuperFast, and its choice to press collections after notice—while pointing merchants to a Supervest email for payment-relief requests—make it jointly responsible for the enterprise's conduct and enrichment from this fraud-induced deal. This is further supported by the fact that Supervest did not adjust Plaintiffs' loan balance after claw back of commissions despite its clear requirement to do so.

113.   Supervest had the practical ability to direct complete rescission and chose not to; that decision locks in Supervest's ratification and liability alongside the other Super Top Defendants.

## "ALTERNATIVE CAPITAL GROUP" ACTING AS CONTRACTUAL SHIELD AND ALTER-EGO VEHICLE

114.   On paper, ACG (Alternative Capital Group LLC) is the counterparty in the Agreement. In practice ACG operated as a contractual shield rather than the true source of funds. ACG had no working website or listed phone number; mail

sent to its listed Delancey Street address was returned; and ACG's correspondence was signed and sent by Andrew Baldwin from a SuperFast domain. These facts show that ACG's role was to hold signature-line exposure to ultimately protect the Super Top Defendants.

115.    Nicole's description of the "stack" (of entities)—in which one affiliate "brings" part of the funding and another "brings" the rest—confirms that ACG operated as a paper wrapper in a pre-arranged syndication platform, not as an arm's-length lender making independent credit decisions. Nicole's further admission that she "didn't really know" ACG's role and that they created the entity for "protection" underscores ACG's function as a liability shield that protected the unified enterprise functions of origination, syndication, funding, servicing, and enforcement.

116.    Additionally, 85 Delancey St., New York, NY 10002 appears as ACG's contract address and also as SuperFast's UCC-1 address.[6]

117.    In this transaction ACG acted as the alter ego of the Super Top Defendants. The Super Top Defendants exercised complete domination of ACG in this transaction and used that domination to perpetrate and ratify a fraud against Plaintiff.

118.    Because ACG did not actually furnish the funds, its designation in the Agreement as the "Funder" was materially false. The Agreement therefore lacks consideration from ACG and is voidable at Plaintiff's election, including by complete rescission.

## SUPERFAST UNAUTHORIZED UCC-1 FILING

119.    The Florida UCC-1 was filed on February 21, 2025, by Joseph Vaknen on

---

[6] Mail sent to SuperFast at that address was returned "refused/not at this address."

behalf of SuperFast, which is not the contracting entity and received no grant of security interest from Plaintiff. The filing office recorded it as File No. 202500452261. Exhibit C, UCC-1.

120.   Notably the UCC-1 could not have been filed by Joseph Vaknen because Joseph Vaknen is dead. By the time this transaction took place Nicole was operating at his old position of managing and communicating with the Super Top Defendants' broker network. This makes the UCC-1 filed by the Super Top Defendants clearly fraudulent on its face.

121.   Per the UCC-1, SuperFast Capital, Inc. as "Secured Party," claimed "ALL" of MedTech's (MT Products LLC) present and after-acquired assets as collateral "pursuant to the Revenue Purchase Agreement." SuperFast is not a party to the Agreement MedTech signed which names Alternative as the "Purchaser/Funder." Therefore, the UCC filing lacked authorization under UCC § 9-509, which created a cloud on Plaintiff's business assets.

122.   MedTech never signed a security agreement with SuperFast, never authorized SuperFast to file a financing statement, and never granted SuperFast any security interest. Under Fla. Stat. § 679.509(1), a financing statement is effective only if the debtor authorizes the filing or a security agreement authenticates the grant. No such authorization exists as to SuperFast; the filing was therefore unauthorized.

123.   The unauthorized lien immediately impaired MedTech's ability to obtain working capital and encumbered routine vendor relationships. After MedTech gave written and oral notice of the origination fraud, Forged Addendums, and coached funding call, the Super Top Defendants did not terminate the lien or suspend collections through Top Choice.

**CURE AN UNLICENSED DEBT COLLECTOR**

124.   Cure Payment Recovery Solutions, LLC, serves as the merchant support and debt collection arm of the enterprise, operating under the guise of 'merchant support' while functioning as an unlicensed debt collector. Cure handles post-funding communications with merchants, processes payment relief requests, and transitions to enforcement activities when accounts fall behind. Despite marketing itself as merchant support, Cure's communications consistently focus on debt collection activities including balance resolution, payment modifications, and demands for financial documentation.

125.   On December 31, 2021, Cure's Florida debt collection license expired and was never renewed. According to the Florida Office of Financial Regulation, Cure has operated as an unlicensed debt collector in Florida since January 1, 2022. All debt collection activities conducted by Cure in Florida after December 31, 2021, constitute unlawful, unlicensed collection activity.

126.   After Plaintiff provided written notice of fraud on April 15-17, 2025, Cure continued debt collection activities without proper licensing. On April 17, 2025, Cure acknowledged the fraudulent broker but immediately pivoted to debt collection.

127.   On August 19, 2025, when Plaintiff informed Cure of inability to cover a pending debit, Cure provided detailed debt collection instructions: "Unfortunately, the payment is already pending. DO NOT STOP the payment. LET IT BOUNCE. The NSF fee is thousands of dollars less than the stop payment fee... Cure provided alternative debt collection procedures to meet up with the payment schedule.

128.   In all communications constituting debt collection activity, including the April 17, 2025, and August 19, 2025 emails, Cure failed to provide the required FDCPA "Mini-Miranda" disclosure ("This is an attempt to collect a debt...") and

other statutorily mandated notices required under 15 U.S.C. § 1692e(11) and § 1692g.

129. Despite engaging in classic debt collection activities—discussing balances, payment modifications, reprieve options, and demanding financial documentation—Cure misrepresented its role by styling itself as "merchant support" to avoid debt collection regulations and licensing requirements.

## SUPER TOP DEFENDANTS' VIOLATION OF NEW YORK'S COMMERCIAL FINANCE DISCLOSURE LAW (CDFL) PERPETUATES THE FRAUD

130. The Super Top Defendants' tolerance for fraudulent broker practices was not isolated to EZ Advance but represented a systematic business model designed to maximize transaction volume while avoiding liability for broker misconduct. Industry investigations by the FTC, New York Attorney General, and Manhattan District Attorney have revealed widespread fraudulent practices within the merchant cash advance sector, including the exact schemes perpetrated against Plaintiff.

131. Nicole's admission that fraudulent broker practices were "common" and that the enterprise-maintained procedures specifically designed to identify and eliminate "bad brokers" demonstrate that the Super Top Defendants had actual knowledge that broker fraud was endemic to their business. Despite this knowledge, the truth is that the Super Top Defendants chose to implement due diligence procedures that were deliberately inadequate to detect obvious fraudulent activity.

132. The Super Top Defendants' systematic failure to conduct meaningful website verification, identity authentication, or licensing verification created a safe haven for fraudulent brokers like Gabriel Shamuelov to operate with

impunity. This was not negligent oversight but a conscious business decision to prioritize transaction volume over merchant protection.

133.   The Super Top Defendants were well aware of their obligations under New York's Commercial Finance Disclosure Law (CFDL), which took effect August 1, 2023.

134.   The CFDL requires pre-offer written disclosures of material terms, costs, and the nature of the financing relationship. The Super Top Defendants' own verification-call procedures demonstrate that they knew these obligations yet adopted a compliance architecture that omits the required written broker disclosures.

135.   Before communicating any specific commercial financing offer, The Super Top Defendants failed to furnish the written broker disclosures mandated by 23 NYCRR § 600.21(b)–(c), (f)—identifying any broker/intermediary, describing the broker's role, stating how and by whom the broker would be compensated, and documenting transmission to the recipient.

136.   Although SuperFast's records listed Matt Owens as the submitting broker for Plaintiff's file, no written broker disclosure was provided and no transmission was documented. A scripted verification call asking whether Plaintiff had been "promised anything" does not satisfy or cure these written-disclosure duties.

137.   The verification "funding" call also omitted the basic questions necessary to detect broker involvement. There was no inquiry into whether Plaintiff knew that a broker/intermediary involved; the broker's status; or knowledge of broker's compensation/commission. This inadequate procedure ensured that the record would not capture fraud indicators and that statutory disclosures would never be generated.

138.  Had the required written broker disclosures been furnished, Plaintiff would have learned that Matt Owens was a broker for EZ Advance (Gabriel Shamuelov) and that he would receive a commission. Those facts would have exposed the impersonation of Matt Owens as a SuperFast representative, and Plaintiff would not have proceeded with the transaction.

139.  The Super Top Defendants' choice to rely on a minimalist verification call while eschewing mandatory written broker disclosures—together with their tolerance of brokers using false names and the absence of identity verification— reflects a deliberate compliance-avoidance framework that prioritizes transaction volume over merchant protection.

## ENTERPRISE LIABILITY

140.  The coordinated operations of ACG (Alternative Capital Group), SuperFast Capital, Top Choice Financial, Cure Payment, and Supervest constitute a single business enterprise designed to originate, syndicate, fund, service, and collect merchant cash advances while dispersing liability across the defendant corporate entities.

141.   At all relevant times, EZ Advance, ACG, SuperFast, Top Choice, Cure, and Supervest/SV Capital constituted an association-in-fact enterprise within 18 U.S.C. § 1961(4), with the common purpose of originating, syndicating, funding, servicing, and collecting merchant-cash-advance transactions while dispersing liability across affiliates.

142.  This integrated enterprise operates through: (a) shared personnel, including Nicole Orme who simultaneously represents Top Choice Financial and Supervest; (b) unified communication systems, with all entities using overlapping email domains and phone systems; (c) coordinated legal responses, with Andrew Baldwin representing multiple defendants; (d) shared physical

addresses at 61 Broadway, 85 Delancey Street, and 1500 Broadway in New York; (e) integrated technology platforms, with Top Choice processing ACH debits for SuperFast/ACG transactions; and (f) synchronized enforcement actions, including joint collection efforts and coordinated UCC filings across state lines.

143. Within that enterprise, EZ Advance handled origination (including through fabricated identities); ACG served as the nominal contractual "funder"/paper holder and liability shield; SuperFast conducted the funding call and pursued lien filing and enforcement; Top Choice performed ACH processing and sub-servicing; Cure conducted the funding call and handled merchant communications via the SuperFast-branded support channel; and Supervest/SV Capital supplied/syndicated capital and controlled investor reporting. The enterprise had an ongoing organizational structure and functioned as a continuing unit.

144. Under the single business enterprise doctrine, the Super Top Defendants demonstrate "(1) such a unity of interest and ownership that the separate corporate personalities are merged, so that one corporation is a mere adjunct of another or the two companies form a single enterprise; and (2) an inequitable result if the acts in question are treated as those of one corporation alone."

145. The Super Top Defendants exhibited the hallmarks of a unified enterprise: shared personnel (Nicole working for multiple corporate defendants), integrated operational systems (Top Choice processing payments for SuperFast/ACG transactions), coordinated legal responses (Andrew Baldwin representing multiple corporate defendants), shared email domains and communication systems, shared physical addresses, and synchronized enforcement actions (joint collection efforts and UCC filings).

146.   The Super Top Defendants structured their operations as a joint venture
with "an agreement, a common purpose, a community of pecuniary interest, and
an equal right of control" in the merchant cash advance business. Each entity
contributed essential elements: EZ Advance provided origination; ACG
provided legal liability protections; SuperFast provided branding and
enforcement; Top Choice provided processing and servicing; Cure provided
merchant relations; and Supervest provided capital syndication.

147.   The Super Top Defendants owed Plaintiff a duty of reasonable care in the
selection, supervision, and monitoring of their broker network, given their
superior knowledge of industry fraud patterns and their control over the broker
approval and monitoring processes.

148.   Having undertaken the responsibility of vetting and approving brokers,
the Super Top Defendants had a duty to exercise reasonable care in detecting
obvious red flags, including wholesale copying of legitimate lenders' websites,
use of fictitious identities, and representations that their brokers were direct
lenders.

149.   The Super Top Defendants' systematic failure to implement basic
verification procedures—despite their acknowledged knowledge of widespread
broker fraud—constituted gross negligence in their supervision of the broker
network that directly enabled the fraud perpetrated against Plaintiff.

150.   The Super Top Defendants knowingly provided substantial assistance to
Gabriel Shamuelov's fraudulent scheme by: (a) accepting and processing loan
applications from brokers using fictitious identities; (b) failing to verify obvious
website plagiarism and false lender representations; (c) establishing inadequate
protocols which allow brokers to coach merchants during verification calls; and
(d) continuing to process transactions from brokers despite having received prior

complaints about misrepresentation and fraud from past deals.

151.    The Super Top Defendants' provision of internal system access, and due diligence methods to EZ Advance and upon information and belief other fraudulent brokers constituted substantial assistance that was essential to the success of the fraudulent scheme. Without the Super Top Defendants' institutional backing and processing infrastructure, Gabriel Shamuelov could not have successfully perpetrated the sophisticated fraud that injured Plaintiff.

152.    The Super Top Defendants' willfully blind design of a due diligence system intended to avoid detecting broker fraud, combined with their continued enforcement of agreements they knew were fraudulently induced, constitutes unconscionable conduct that shocks the conscience and violates fundamental fairness.

153.    The Super Top Defendants' post-notice conduct, maintaining weekly collections  ""when they knew the funds had been disbursed based on fraud, demonstrates a systematic strategy to retain the benefits of fraudulent transactions while avoiding responsibility for enabling the underlying misconduct.

154.    The offer of recission upon return of funds from Plaintiff was tone deaf to the massive fraud that took place, additionally the interest profiteering from collection activity should have ceased. They were aware that the Plaintiff business lacked financial liquidity and had already utilized the money for operations months prior to the offer to return the capital.

155.    Following actual notice of Gabriel Shamuelov's fraud on April 16, 2025, the Super Top Defendants chose to ratify the unauthorized conduct by continuing to: (a) maintain the UCC lien filed by SuperFast Capital; (b) collect weekly payments through Top Choice Financial's processing system; (c) refuse

to credit back any portion of the fraudulently obtained and clawed back commission; and (d) maintain unified legal representation through Andrew Baldwin.

156. The Super Top Defendants' acceptance of the benefits of Gabriel Shamuelov's unauthorized conduct after receiving notice of its fraudulent nature binds them as principals to the full scope of his misconduct, making them jointly liable for all resulting damages.

## THE FUNDING WAS A LOAN NOT A PURCHASE FOR FUTURE RECEIVABLES

157. Although styled as a "purchase of future receivables," the transaction functioned in substance as a loan. A true receivables purchase shifts the risk of non-collection to the purchaser and adjusts remittances with revenue; here, the risk remained squarely with MedTech. If revenues dipped, Defendants did not accept proportionate reductions as a matter of course; they continued debits at the fixed rate and treated any deviation as default exposure—conduct consistent with a secured loan.

158. The agreement's "reconciliation" language—Defendants' lone nod to contingency—was illusory by design. The contract directed merchants to request payment reductions through admin@supervestcap.com an investor-platform address unconnected to a working domain, therefore emails sent by Plaintiff to said email bounced back.

159. Remedies and enforcement were unmistakably lender-like. SuperFast (which was not the named "Funder") filed a Florida UCC-1 against MedTech's assets to secure repayment, while Top Choice debited the fixed weekly amounts as "Authorized Sub-Servicing Agent," and Cure continued merchant-support collection efforts after notice. A purchaser of contingent receivables does not

need a blanket lien and weekly fixed withdrawals; a lender does.

160.  Defendants' post-notice posture confirms the debt characterization. Defendants clawed back the broker commission (approximately $7,500–$10,000) yet refused to credit any portion of that specific, identifiable amount back to MedTech while continuing to collect the full face sum.

161.  Taken together—(i) fixed, scheduled remittances; (ii) no genuine risk transfer; (iii) an inoperative, off-channel "reconciliation" conduit; (iv) lender-style remedies including a UCC-1 lien; and (v) a post-notice demand for immediate principal—this transaction is a loan in substance notwithstanding its MCA label. The "reconciliation" provision functioned as a facade to avoid scrutiny while providing no practical mechanism to align payments with actual receipts.

## STATEMENT OF CLAIM

### COUNT I
### RICO ENTERPRISE VIOLATION (18 U.S.C. § 1962[c])
(AGAINST ALL DEFENDANTS)

162.  Plaintiff repeats, re-alleges, and incorporates by reference all preceding paragraphs as though fully set forth herein.

163.  At all times material hereto, the Super Top Defendants, along with EZ Advance and Gabriel Shamuelov, operated as an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) ("the Enterprise").

164.  The Enterprise was an ongoing organization with a common purpose: to originate, fund, service, and enforce merchant cash advance receivables through systematic use of fraudulent brokers, forged documentation, and deceptive business practices designed to maximize profits while obscuring liability through a complex multi-entity structure.

165. The Enterprise had an ascertainable structure consisting of: (a) EZ Advance serving as the origination pipeline using fraudulent identities; (b) SuperFast providing brand legitimacy and filing unauthorized liens; (c) ACG serving as the contractual shield entity; (d) Top Choice processing payments and maintaining investor records; (e) Supervest/SV Capital Management aggregating investor capital and distributing funds and returns; and (f) Cure handling customer service and collections enforcement.

166. Each Defendant participated in the operation and management of the Enterprise through a pattern of racketeering activity, including multiple acts of wire fraud, mail fraud, and money laundering, as more particularly described herein.

167. The pattern of racketeering activity consisted of at least the following predicate acts: (a) multiple instances of wire fraud in violation of 18 U.S.C. § 1343 through the use of interstate wire communications to execute the fraudulent scheme; (b) mail fraud in violation of 18 U.S.C. § 1341 through the use of DocuSign and email transmission of forged documents; and (c) money laundering in violation of 18 U.S.C. § 1956 through the structuring and movement of fraudulently obtained payments through multiple corporate defendants.

168. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property in an amount to be proven at trial.

169. Plaintiff is entitled to treble damages, costs, and reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II
## RICO CONSPIRACY (18 U.S.C. § 1962[d])
### (AGAINST ALL DEFENDANTS)

170.  Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

171.  At all times material hereto, each Defendant knowingly and willfully conspired with the other Defendants to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of the Enterprise through a pattern of racketeering activity.

172.  The conspiracy was evidenced by, among other things: (a) the coordinated use of multiple corporate defendants to obscure liability while maintaining operational control; (b) the systematic acceptance and processing of deals from fraudulent brokers like EZ Advance; (c) the continued enforcement of fraud-induced agreements after receiving actual notice of the underlying fraud; (d) the filing of unauthorized UCC liens to maintain leverage over defrauded merchants; and (e) the sharing of customer information and coordination of collection activities among the conspirators.

173.  The scheme involved: (a) Shamuelov's impersonation of SuperFast Capital employees using false identities "Matt Owens" and "Jason Caldwell"; (b) creation and transmission of forged addendums bearing SuperFast's logo promising guaranteed future funding; (c) misrepresentation of broker relationships and commission structures; and (d) coaching Plaintiff to lie during verification calls to conceal the fraudulent nature of the transaction.

174.  In furtherance of this scheme, Defendants knowingly made material misstatements including: (a) that Plaintiff was pre-approved for $525,000 in total funding across three rounds; (b) that Matt Owens had authority as a Senior Finance Officer to guarantee future funding; (c) that the forged addendum was authorized by SuperFast's legal counsel; and (d) that substitution to Alternative Capital Group was merely administrative while SuperFast remained the true

lender.

175.  Defendants transmitted and caused to be transmitted these material misrepresentations via interstate wire communications including emails from matt@ezadvancellc.com, text messages, phone calls, and DocuSign transmissions of forged documents.

176.  Each conspirator performed overt acts in furtherance of the conspiracy, including but not limited to: failing to disclose broker relationships and commissions, allowing the use of aliases, processing fraudulent loan applications, filing unauthorized liens, debiting merchant accounts despite knowledge of fraud, refusing to rescind fraud-induced agreements, clawing back commissions without providing reconciliation to Plaintiff's debt.

177.  As a direct and proximate result of Defendants' conspiracy to violate RICO, Plaintiff has been injured in its business and property in an amount to be proven at trial.

178.  Plaintiff is entitled to treble damages, costs, and reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT III
## FLORIDA CIVIL RICO (FLA. STAT. § 772.103)
### (AGAINST ALL DEFENDANTS)

179.  Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

180.  The enterprise operated as an integrated pipeline where: EZ Advance funneled fraudulent originations; SuperFast handled funding verification and filed liens; ACG supplied contractual documentation; Top Choice processed ACH debits and provided portfolio reporting; Cure managed merchant support

and collections; and Supervest/SV Capital Management aggregated investor capital to fund loans and distributed returns.

181.  The Enterprise had an ongoing structure and functioned as a continuing unit, with distinct roles that included, among other things: (i) origination through a fabricated broker identity Matt Owens tied to EZ Advance; (ii) papering/contract shielding through ACG; (iii) funding-call scripting, lien filings, and enforcement by SuperFast; (iv) ACH processing/sub-servicing by Top Choice; (v) merchant communications/collections via Cure using SuperFast-branded channels; and (vi) capital/syndication and investor-reporting by Supervest/SV Capital. Personnel, systems, and communications overlapped across multiple corporate defendants.

182.  Each Defendant was employed by or associated with the Enterprise and conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of criminal activity, in violation of Fla. Stat. § 772.103(3).

183.  The "pattern of racketeering activity" consists of multiple related and continuous predicate acts, including but not limited to:

a) Wire fraud (18 U.S.C. § 1343) and/or mail fraud (18 U.S.C. § 1341), by transmitting and causing to be transmitted: (i) forged/false addenda and other documents through DocuSign and email; (ii) false statements guaranteeing follow-on funding rounds and misrepresenting broker status and funder identity; and (iii) coached verification-call scripts designed to conceal the impersonation and induce execution and performance.

b) Financial-institution fraud (18 U.S.C. § 1344) and/or related federal predicates (18 U.S.C. § 1961(1)), by using interstate banking channels and ACH debits to obtain and retain monies under false pretenses.

c) Florida fraudulent practices under Chapter 817, including filing false
records against property (e.g., § 817.535) and other fraud-based offenses,
by causing an unauthorized Florida UCC-1 filing to cloud title to
Plaintiff's assets and coerce performance on a fraud-induced agreement.

d) Conspiracy/solicitation/attempt to commit the foregoing, as encompassed
within Fla. Stat. § 772.102.

184. Defendants processed numerous EZ Advance-originated deals and
received multiple merchant complaints describing the same tactics (non-existent
follow-on funding, coached calls, and broker-status misstatements) yet
continued to route EZ Advance submissions through the same origination,
funding, servicing, and collection channels.

185. Each Defendant knowingly agreed to facilitate and did facilitate the
scheme by performing his/her/its assigned role in the enterprise.

186. Conspiracy (in the alternative and in addition). Each Defendant conspired
with one or more co-Defendants to violate § 772.103(3) by agreeing that at least
two criminal acts would be committed to further the enterprise's unlawful
purposes.

187. Plaintiff was injured by reason of Defendants' violations of § 772.103 and
seeks threefold actual damages sustained (with a minimum recovery as provided
by statute), together with reasonable attorneys' fees and costs.

## COUNT IV
## AIDING AND ABETTING FRAUD (FLA. LAW)
### (AGAINST ALL DEFENDANTS)

188. Plaintiff repeats and realleges each and every allegation contained in the
preceding paragraphs as though fully set forth herein.

189. Among other things, Gabriel Shamuelov using the alias Matt Owens and

EZ Advance LLC misrepresented material facts to induce Plaintiff to enter and perform under the transaction, including (a) impersonating a SuperFast executive, (b) promising non-existent "follow-on" funding rounds, (c) transmitting forged/falsified addenda, and (d) concealing the true broker role/compensation and the identity of the actual "funder."

190.    Each Defendant knew of or was willfully blind to the fraud, as evidenced by:

a)  Internal records listing Matt Owens as the submitting broker while defendants knew it was an alias;

b)  Repeated merchant complaints and at least ~10 prior EZ Advance deals reflecting the same tactics (coached verification calls, false follow-on promises, broker-status misstatements);

c)  Admissions by Elisa/Lauren that Matt Owens was a broker and that "Jason Caldwell" (purported legal sign-off) did not exist in their records;

d)  Admissions by Nicole that alias use was "really common practice," that she had not reviewed EZ Advance's website (which plagiarized Rapid Finance content), and that "we do not do background checks on everybody;"

e)  Andrew Baldwin's April 24, 2025, response acknowledging fraud but refusing remediate relying on funding call for protection; and

f)  The filing/maintenance of a Florida UCC-1 by deceased Joseph Vaknen on behalf of SuperFast, despite SuperFast not being the contracting "funder" and having no authorized security interest.

191.    With such knowledge (or deliberate avoidance), Defendants substantially assisted the fraud by, among other things:

a) SuperFast through willful blindness allowed coaching of the verification call filed and maintained an unauthorized UCC-1; and refused complete rescission while continuing collections;

b) ACG served as the nominal "funder"/paper holder to shield and legitimize the transaction despite not providing consideration;

c) Top Choice processed weekly ACH debits thereby extracting proceeds of the fraud;

d) Cure handled merchant communications and collections through a SuperFast-branded channel, reinforcing the deception and continuing performance;

e) Supervest and SV Capital Management supplied/syndicated capital, shared personnel, and leveraged investor reporting to discourage complete rescission or remediation; and

f) EZ Advance and Shamuelov furnished the fabricated identity, misrepresentations, and forged/falsified documents that initiated the transaction; and

192.  Defendants' assistance was a substantial factor in the success of the fraud and its continuation—causing Plaintiff to execute the agreement, continue performance, suffer ongoing ACH withdrawals, and operate under a clouded title created by the unauthorized lien.

193.  Plaintiff reasonably relied on the misrepresentations and omissions induced and maintained by Defendants' assistance and suffered damages, including but not limited to payments made and extracted by ACH, costs and impairment associated with the unauthorized UCC-1, loss of use of funds and business opportunities, and other consequential losses.

194.   Plaintiff seeks compensatory damages, costs, punitive damages, and injunctive relief.

## COUNT V
## **FRAUDULENT INDUCEMENT (FLA. LAW)**
## (AGAINST GABRIEL SHAMUELOV AND EZ ADVANCE LLC)

195.   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

196.   Defendants made material misrepresentations of fact to Plaintiff, including but not limited to: (a) false representations regarding Shamuelov's identity and authority; (b) false promises of guaranteed future funding totaling $525,000; (c) fraudulent concealment regarding the nature of the funding/broker relationship and commission structure; and (d) false representations regarding the authorization and legitimacy of the funding addendum.

197.   These representations were false when made, and Defendants knew them to be false or made them with reckless disregard for their truth.

198.   Defendants made these misrepresentations with the intent to induce Plaintiff to enter into the funding agreement.

199.   Plaintiff justifiably relied on these misrepresentations in deciding to execute the funding agreement, as evidenced by Plaintiff's stated refusal to accept the loan without the guaranteed future funding components.

200.   As a direct and proximate result of Defendants' fraudulent inducement, Plaintiff has suffered actual damages and consequential damages from lost business opportunities.

201.   Defendants' conduct was willful, wanton, and malicious, justifying an award of punitive damages.

## COUNT VI

## **CIVIL CONSPIRACY TO COMMIT FRAUD (FLA. LAW)**
### (AGAINST ALL DEFENDANTS)

202.   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

203.   At all relevant times, Defendants—EZ Advance LLC, Alternative Capital Group LLC, SuperFast Capital Inc., Top Choice Financial LLC, Cure Payment Recovery LLC, Supervest, LLC, SV Capital Management LLC, and Gabriel Shamuelov a/k/a Matt Owens, were separate legal persons who combined, confederated, and agreed with each other to defraud Plaintiff.

204.   The conspiratorial agreement—express or implied—was to procure Plaintiff's execution and performance of an MCA transaction through material misrepresentations and omissions, to conceal the use of a fabricated broker identity and the absence of promised follow-on funding, and to enforce the transaction through unauthorized lien filings and continued collections.

205.   The agreement and meeting of the minds can be inferred from Defendants' coordinated roles and conduct, including:

   a) Shamuelov, under the alias "Matt Owens," posing as a SuperFast executive, transmitted forged/falsified addenda and made false assurances of guaranteed follow-on rounds;

   b) Super Top Defendants allowed the use of aliases and lack proper vetting mechanisms when transacting with brokers;

   c) ACG was inserted as the nominal "Funder"/paper holder while SuperFast controlled the funding call and enforcement;

   d) Defendants staged and coached the funding call to steer answers, conceal the broker's identity/compensation, and create a post-hoc "record" to

justify enforcement;

e)  Top Choice processed weekly ACH debits as "Authorized Sub-Servicing Agent" and Cure handled merchant communications through SuperFast-branded channels;

f)  Supervest/SV Capital syndicated and supplies capital and, through shared personnel, discouraged complete rescission to protect investor reporting;

g)  Jospeh Vaknen, a deceased individual somehow caused a Florida UCC-1 to be filed and maintained on behalf of SuperFast despite SuperFast not being the contracting entity and having no authorized security interest;

h)  After written notice of fraud, Baldwin (for SuperFast/ACG) acknowledged fraud yet refused complete rescission; Defendants continued debits and clawed back the broker's commission without crediting Plaintiff;

i)  Defendants used overlapping addresses, shared personnel (including "Nicole"), common email channels (e.g., superfastmerchantsupport@curepayment.com), and synchronized enforcement—hallmarks of a coordinated plan.

206.  In furtherance of the conspiracy, one or more Defendants committed overt acts including (without limitation) the false statements and forged documents transmitted by wire/mail, the coached funding call, the unauthorized UCC-1 filing, and the continued ACH debits and collection communications.

207.  Each Defendant knew of the conspiracy's general scope and purpose and intended to participate in achieving it, or knowingly joined the conspiracy with awareness that one or more co-conspirators would commit wrongful acts to accomplish its objectives.

208.  Each Defendant is jointly and severally liable for all torts and damages caused by any co-conspirator's overt acts in furtherance of the conspiracy, including the underlying fraudulent inducement and concealment.

209.  Plaintiff reasonably relied on the false statements and omissions induced and maintained by the conspiracy and was injured in his business and property as a direct and proximate result, including but not limited to: execution and performance of a fraud-induced agreement; weekly ACH withdrawals from Plaintiff's Florida operating account; cloud on title and credit/operational harm from the unauthorized UCC-1; and other consequential losses.

210.  Defendants' conduct was intentional, malicious, and in reckless disregard of Plaintiff's rights, warranting an award of punitive damages to deter similar misconduct.

211.  Plaintiff seeks compensatory damages, costs, punitive damages, and injunctive relief.

**COUNT VII**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE
PRACTICES ACT (FLA. STAT. § 501.204)**
(AGAINST SUPERFAST CAPITAL INC., ALTERNATIVE CAPITAL
GROUP LLC, TOP CHOICE FINANCIAL INC, CURE PAYMENT
RECOVERY SOLUTION LLC, SUPERVEST, INC, SV CAPITAL
MANAGEMENT LLC, AND EZ ADVANCE LLC)

212.  Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

213.  At all times material hereto, Defendants were engaged in trade or commerce within the meaning of Fla. Stat. § 501.203.

214.  Defendants engaged in deceptive and unfair acts or practices in violation

of Fla. Stat. § 501.204, including but not limited to:

a) Allowing for use of fabricated identities and failing to provide legal disclosures—causing Gabriel Shamuelov to impersonate a SuperFast executive and to present forged or falsified addenda to induce execution and performance;

b) Misrepresenting the "funder" and promised funding—papering the deal to ACG while representing that SuperFast controlled and guaranteed follow-on rounds that did not in fact exist;

c) Staging/coaching the verification call to conceal the impersonation and steer "correct" answers rather than verify the truth;

d) Concealing broker status and compensation—failing to provide required written pre-offer disclosures of broker identity/role/compensation and transmission documentation, while listing Matt Owens as the submitting ISO internally;

e) Filing and maintaining an unauthorized lien—causing a Florida UCC-1 to be filed and maintained against Plaintiff's assets by a non-party to the contract and refusing to terminate it after notice;

f) Continuing collections after notice—continuing weekly ACH debits and enforcement after admitting fraud and clawing back the broker's commission, thereby ratifying, and profiting from the fraud;

g) Operating through alter-egos and shared systems (SuperFast/ACG/Top Choice/Cure/Supervest/SV Capital Management/EZ Advance) to create plausible deniability while reaping origination, servicing, and investor-reporting benefits; and

h) Systemic negligence and deliberate blind spots—outsourcing broker

screening, failing to verify identity/licensing, and ignoring obvious red flags (e.g., EZ Advance's plagiarized website and use of aliases).

215.  These deceptive practices were likely to mislead reasonable consumers acting reasonably under the circumstances and offend public policy as established by federal and state laws governing lending and business practices.

216.  Defendants' omissions and misrepresentations concerned material facts—including who the broker was, who was being paid, who the funder was, whether follow-on funding existed, and whether any security interest was authorized.

217.  Defendants' unfair practices included: (a) taking advantage of consumers' inability to reasonably protect their interests due to information asymmetries; (b) using unconscionable collection practices against merchants known to be fraud victims; and (c) employing systematic deceptive practices designed to obscure accountability and evade regulatory oversight.

218.  Had the truth been disclosed (including the written pre-offer broker disclosures and the absence of real follow-on funding), Plaintiff would not have entered into or performed under the transaction.

219.  As a direct and proximate result of Defendants' FDUTPA violations, Plaintiff suffered actual damages.

220.  Plaintiff seeks compensatory damages, injunctive relief including an order: (i) enjoining further collection efforts and ACH debits; (ii) enjoining use, maintenance, or enforcement of the unauthorized UCC-1 and requiring its termination, and attorney's fees as provided by Fla. Stat. § 501.2105 and § 501.211(2).

## COUNT VIII
## UNAUTHORIZED UCC FILING & DAMAGES (UCC § 9-625)
### (AGAINST SUPERFAST CAPITAL, INC.)

221.  Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

222.  On February 21, 2025, Defendant SuperFast Capital (through a deceased individual Joseph Vaknen), without authorization from Plaintiff, filed UCC-1 Financing Statement No. 202500452261 in Florida claiming a security interest in "ALL" of Plaintiff's present and after-acquired assets.

223.  SuperFast Capital is not named as a party to the Revenue Purchase Agreement and received no grant of security interest from Plaintiff.

224.  Because the UCC-1 was filed without debtor authorization and names a party that is not the contracting "funder," the filing is ineffective and noncompliant with Chapter 679, including § 679.509.

225.  SuperFast Capital's unauthorized filing violated UCC § 9-625 and has caused Plaintiff damages including: (a) clouding of title to Plaintiff's business assets; (b) interference with Plaintiff's ability to obtain credit; (c) costs associated with attempting to remove the unauthorized filing; and (d) ongoing reputational harm to Plaintiff's business.

226.  The unauthorized filing was made willfully and with knowledge that SuperFast Capital lacked any security interest in Plaintiff's assets, justifying statutory damages under UCC § 9-625(b), and (e).

227.  Under Fla. Stat. § 679.625(1), a person that fails to comply with Chapter 679 is liable for damages in the amount of any loss caused by that failure. The unauthorized filing and its maintenance constitute such noncompliance, proximately causing Plaintiff's losses.

228.  In addition, the Court may award equitable relief under § 679.625,

including restraining further enforcement based on the unauthorized filing and
ordering appropriate corrective filings.

229.  Plaintiff seeks termination and removal of the unauthorized UCC filing,
actual damages, losses statutory damages of not less than $500, and attorney's
fees.

**COUNT IX**
**<u>SLANDER OF TITLE (FLA. LAW)</u>**
(AGAINST SUPERFAST CAPITAL, INC.)

230.  Plaintiff repeats and realleges each and every allegation contained in the
preceding paragraphs as though fully set forth herein.

231.  Defendants SuperFast Capital published false statements regarding
Plaintiff's title to its business assets by filing the unauthorized UCC-1 lien
claiming a security interest in "ALL" of Plaintiff's assets.

232.  These statements were false because SuperFast Capital never received any
grant of security interest from Plaintiff and is not named as a secured party in
any agreement executed by Plaintiff.

233.  Defendants knew or reasonably should have known at the time of filing
that the false UCC filing would likely result in inducing others not to deal with
Plaintiff by creating a cloud on Plaintiff's business assets.

234.  In fact, the false UCC filing has played a material and substantial part in
interfering with Plaintiff's business relationships and creditworthiness.

235.  As a direct and proximate result of Defendants' publication of these false
statements, Plaintiff has suffered special damages including interference with
business credit, costs of attempting lien removal, and reputational harm to its
business operations.

236.  Defendants' conduct was willful and malicious, justifying an award of

punitive damages.

## COUNT X
## NEGLIGENT UNDERTAKING / SUPERVISION (FLA. LAW)
(AGAINST SUPERFAST CAPITAL INC., ALTERNATIVE CAPITAL
GROUP LLC, TOP CHOICE FINANCIAL INC, CURE PAYMENT
RECOVERY SOLUTIONS LLC, SUPERVEST, INC, AND SV CAPITAL
MANAGEMENT LLC)

237.   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.[7]

238.   Independently of any contract, the Super Top Defendants undertook to design and implement merchant-protection, verification, and compliance procedures (including broker/ISO onboarding and screening, the funding "verification" call, merchant support and collections, and lien/UCC controls), and to supervise the brokers/ISOs and sub-servicers (including Top Choice and Cure) they used to originate, service, and collect MCA transactions. Having so undertaken, they owed Plaintiff a duty to exercise reasonable care in performing those services so as not to increase the risk of harm, to perform duties they undertook with due care, and not to induce reliance through illusory safeguards.

239.   The Super Top Defendants breached those duties by, among other things:

   a) Outsourcing broker/ISO onboarding to a "third-party guy" while conducting no identity or licensing verification of Matt Owens (Gabriel Shamuelov) and allowing use of aliases;

   b) Failing to review EZ Advance's website (which wholesale copied Rapid Finance content and retained Rapid's name), and accepting EZ Advance

---

[7] This is plead in the alternative of the intentional torts.

submissions without basic diligence;

c) Designing a minimalist funding call that asked only whether Plaintiff had been "promised anything," while omitting any inquiry into broker existence/identity/compensation and failing to provide the required written broker disclosures;

d) Failing to correct the broker identity defects;

e) Failing to suspend EZ Advance despite prior, similar merchant complaints after approximately ten prior EZ Advance deals; and

f) After written notice from Plaintiff, declining to unwind the transaction or terminate the lien and maintaining a Florida UCC-1 filed by a non-party to the agreement.

240. The Super Top Defendants negligent undertaking and supervision increased the risk of harm to Plaintiff, and Plaintiff reasonably relied on the Super Top Defendants' purported verification and compliance framework (including the funding call and merchant-support channels). The breaches were a substantial factor in causing Plaintiff's losses.

241. As a direct and proximate result, Plaintiff suffered damages, including payments extracted by weekly ACH debits, loss of use of funds, costs, and credit/operational impairment from the unauthorized UCC-1, and other consequential losses.

## COUNT XI
## NEGLIGENT UNDERTAKING / SUPERVISION (FLA. LAW)
### (AGAINST EZ ADVANCE LLC)

242. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

243.  EZ Advance hired/retained/supervised Gabriel Shamuelov (a/k/a "Matt Owens") to solicit and originate MCA transactions on its behalf.

244.  EZ Advance knew or should have known that Shamuelov was unfit/incompetent and posed a foreseeable risk of harm (use of aliases, forged/falsified addenda, coached verification calls, and false "follow-on" promises), and failed to exercise reasonable care in hiring, retaining, or supervising him.

245.  Shamuelov, acting within the scope (or apparent scope) of his agency for EZ Advance, committed fraudulent acts that caused Plaintiff's injuries.

246.  EZ Advance's negligent hiring, retention, and supervision were a proximate cause of Plaintiff's damages (payments by ACH, loss of use of funds, UCC-related impairment, and other losses).

## COUNT XII
## [CONVERSION (FLA. LAW)]

(AGAINST SUPERFAST CAPITAL INC., ALTERNATIVE CAPITAL
GROUP LLC, TOP CHOICE FINANCIAL INC, CURE PAYMENT
RECOVERY SOLUTION LLC, SUPERVEST, INC, AND SV CAPITAL
MANAGEMENT LLC)

247.  Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

248.  The Super Top Defendants exercised wrongful dominion and control over specific, identifiable funds belonging to Plaintiff, including the fixed, scheduled weekly ACH debits of $2,488.63 taken from Plaintiff's operating account under the February 2025 MCA, as well as all subsequent amounts collected from Plaintiff after written and oral notice of fraud. Those debits were processed through Top Choice Financial in its contractual role as "Authorized

Sub-Servicing Agent," which handled ACH processing and collections for the agreement.

249.   These funds are readily specific and traceable because they were (a) fixed in amount and cadence by the pay schedule; (b) drawn from a single, identified account; and (c) routed through Top Choice's servicing rails identified in the agreement and servicing communications.

250.   Plaintiff provided actual notice that the underlying obligation was procured by fraud—including impersonation by Matt Owens, forged "addendum" documents, and funding-call coaching—and demanded relief. Cure (handling "merchant support" for SuperFast/ACG) received the forged addendum, acknowledged it was not valid, and nevertheless continued enforcement efforts and issued a purported rescission conditioned on immediate return of principal; collections continued thereafter.

251.   SuperFast Capital further asserted dominion by filing and maintaining through a dead individual a Florida UCC-1 lien in its own name despite not being the contracting "Funder," thereby coercing and securing continued payment streams from Plaintiff following notice.

252.   After receiving Plaintiff's fraud notice, the Super Top Defendants clawed back the broker commission paid to EZ Advance—in the range of approximately $7,500–$10,000—yet refused to credit or remit any corresponding amount to Plaintiff and continued to collect as if those sums remained owed. Those clawed-back proceeds are a specific, identifiable pool of funds attributable to Plaintiff's transaction and capable of immediate restitution; Defendants' refusal to credit or return that value is an independent conversion.

253.   By continuing to debit and retain these specific funds (including the weekly ACH debits and the value represented by the clawed-back commission)

after actual notice of fraud and despite Plaintiff's demands to cease and correct, Defendants exercised dominion inconsistent with Plaintiff's rights and without lawful authorization. Cure's records reflect demand-and-response activity in April 2025, yet collections persisted.

254.   Supervest benefited from and/or directed the continued receipt of these post-notice collections through its investor-side syndication platform tied to the same pipeline, and therefore is likewise liable for conversion to the extent it accepted and retained specific proceeds traceable to Plaintiff's payments after notice.

255.   Defendants' actions constituted a substantial interference with Plaintiff's right to possession and use of its funds, converting those funds to Defendants' own use and benefit.

256.   As a direct and proximate result, Plaintiff was deprived of its specific, identifiable funds, suffered loss of use of money, and incurred consequential damages.

## COUNT XIII
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349
(AGAINST SUPERFAST CAPITAL INC., ALTERNATIVE CAPITAL GROUP LLC, TOP CHOICE FINANCIAL INC, CURE PAYMENT RECOVERY SOLUTION LLC, SUPERVEST, INC, SV CAPITAL MANAGEMENT LLC, AND EZ ADVANCE LLC)

257.   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

258.   Defendants engaged in consumer-oriented deceptive acts and practices in the conduct of business, trade, or commerce in violation of N.Y. Gen. Bus. Law § 349.

259. Defendants' conduct was consumer-oriented because it involved systematic practices affecting numerous merchants seeking business funding, as evidenced by the structured enterprise designed to process multiple similar transactions.

260. Defendants' acts and practices were materially misleading to reasonable consumers, including: (a) EZ Advance's false advertising as a direct lender; (b) failure to disclose broker status and compensation; (c) misrepresentation of lending authority and approval processes; (d) use of forged documentation bearing legitimate lender logos; and (e) systematic coaching of borrowers to conceal material facts from verification processes.

261. As a direct and proximate result of these deceptive practices, Plaintiff suffered actual damages including financial losses and injury to business relationships.

262. Plaintiff seeks actual damages, injunctive relief, and attorney's fees as provided by N.Y. Gen. Bus. Law § 349.

## COUNT XIV
## **BREACH OF FIDUCIARY DUTY**

(AGAINST SUPERFAST CAPITAL INC., ALTERNATIVE CAPITAL GROUP LLC, TOP CHOICE FINANCIAL INC, CURE PAYMENT RECOVERY SOLUTION LLC, SUPERVEST, INC, SV CAPITAL MANAGEMENT LLC, AND EZ ADVANCE LLC)

263. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

264. Upon accepting Plaintiff's loan application and processing funding, Defendants owed Plaintiff fiduciary duties including the duties of good faith, fair dealing, and disclosure of material facts affecting the lending relationship.

265.  Defendants breached these fiduciary duties by: (a) accepting and processing loan applications known to be procured through fraud; (b) failing to disclose the unauthorized nature of broker representations; (c) continuing collections after receiving actual notice of fraud; (d) filing unauthorized liens to maintain leverage over a defrauded borrower; and (e) refusing to provide reasonable remedies after learning of the fraudulent inducement.

266.  As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff has suffered damages including the continued obligation to service a fraud-induced debt and loss of business opportunities.

267.  Defendants' conduct constituted a willful breach of fiduciary duty, justifying an award of punitive damages.

## COUNT XV
## [UNJUST ENRICHMENT]
(AGAINST SUPERFAST CAPITAL INC., ALTERNATIVE CAPITAL GROUP LLC, TOP CHOICE FINANCIAL INC, CURE PAYMENT RECOVERY SOLUTION LLC, SUPERVEST, INC, SV CAPITAL MANAGEMENT LLC, AND EZ ADVANCE LLC)

268.  Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

269.  Defendants have been unjustly enriched at Plaintiff's expense by: (a) receiving payments on a loan procured through fraud; (b) retaining broker commissions based on fraudulent representations; (c) earning interest and fees on a debt obligation induced through material misrepresentations; and (d) maintaining a security interest obtained without authorization.

270.  Defendants received these benefits with knowledge of the fraudulent circumstances underlying the transaction, particularly after receiving formal

notice of the fraud on April 15-17, 2025.

271.   It would be inequitable and unjust for Defendants to retain these benefits obtained through fraudulent inducement and continued enforcement against a defrauded borrower.

272.   No adequate remedy at law exists to prevent Defendants' unjust enrichment at Plaintiff's expense.

273.   Plaintiff seeks restitution and disgorgement of all benefits wrongfully obtained by Defendants, including loan payments received, commissions earned, and fees collected in connection with the fraudulently induced transaction.

## COUNT XVI
## DECLARATORY JUDGMENT (28 U.S.C. § 2201; FLA. STAT. CH. 86)
(AGAINST SUPERFAST CAPITAL INC., ALTERNATIVE CAPITAL GROUP LLC, TOP CHOICE FINANCIAL INC, CURE PAYMENT RECOVERY SOLUTION LLC, SUPERVEST, INC, SV CAPITAL MANAGEMENT LLC, AND EZ ADVANCE LLC)

274.   Plaintiff repeats and realleges the preceding allegations as though fully set forth herein.

275.   An actual, present, and justiciable case or controversy exists between Plaintiff and Defendants concerning the parties' respective rights and obligations under the subject Revenue Purchase Agreement (the "RPA") and any asserted security interest or lien arising from or related to the transaction.

276.   Plaintiff contends, that the RPA is void, voidable, and/or subject to unconditional and complete rescission due to fraudulent inducement, material misrepresentations and omissions, failure of consideration (including the use of Alternative Capital Group LLC as a nominal "funder" while SuperFast controlled funding/enforcement), and statutory/regulatory noncompliance—

including the absence of required written broker disclosures and the use of a fabricated broker identity.

277.   Plaintiff further contends that SuperFast Capital Inc. holds no authorized security interest in Plaintiff's assets and that the Florida UCC-1 financing statement filed naming SuperFast as secured party is unauthorized and ineffective; that Defendants have no present right to continue ACH debits or other collection/enforcement under the RPA; and that any reliance on the UCC-1 to coerce performance is unlawful.

278.   The controversy is ripe in that Defendants funded and are collecting on the transaction, have caused or maintained the UCC-1 filing in Florida, and have refused to unwind or terminate the filing upon Plaintiff's written request. Plaintiff faces ongoing weekly withdrawals and a cloud on title to its business assets.

279.   A judicial declaration will terminate and afford relief from uncertainty and insecurity regarding the parties' rights, status, and legal relations, and will guide the parties' conduct going forward. Declaratory relief will also support and streamline the requested injunctive relief.

280.   Under 28 U.S.C. § 2201 and Fla. Stat. ch. 86, Plaintiff is entitled to a declaration of rights and further relief under 28 U.S.C. § 2202 and Fla. Stat. § 86.061.

## COUNT XVII
## VIOLATIONS OF FAIR DEBT COLLECTION PRACTICES ACT
(AGAINST CURE PAYMENT RECOVERY SOLUTIONS, LLC)

281.   Plaintiff repeats and realleges the preceding allegations as though fully set forth.

282.   Cure is a "debt collector" within the meaning of 15 U.S.C. § 1692(a)(6),

as it regularly attempts to collect debts owed to others, including the debt allegedly owed by Plaintiff to the Super Top Defendants.

283.   Cure's April 17, 2025, and August 19, 2025, communications were made for the purpose of collecting a debt and constitute "debt collection" activities under the FDCPA, regardless of Cure's self-designation as "merchant support."

284.   Cure violated the FDCPA by: (a) Failing to provide the required Mini-Miranda disclosure in violation of 15 U.S.C. § 1692e(11); (b) Failing to provide debt validation notice in violation of 15 U.S.C. § 1692g; (c) Misrepresenting its role as "merchant support" while engaging in debt collection in violation of 15 U.S.C. § 1692e; (d) Using deceptive practices to collect debt in violation of 15 U.S.C. § 1692e. As a result of these violations, Plaintiff is entitled to actual damages, statutory damages up to $1,000 per violation, and attorneys' fees under 15 U.S.C. § 1692e.

## COUNT XVIII
## VIOLATIONS OF FLORIDA CONSUMER COLLECTION PRACTICES ACT
(AGAINST CURE PAYMENT RECOVERY SOLUTIONS, LLC)

285.   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

286.   Cure violated the FDCPA by: (a) Operating as a debt collector without a valid Florida license in violation of Fla. Stat. § 559.553(1); (b) Engaging in unlawful debt collection practices in violation of Fla. Stat. § 559.55 et seq.; and (c) Each unlawful communication since December 31, 2021, constitutes a separate violation.

287.   As a result of these violations, Plaintiff is entitled to actual damages, statutory damages up to $1,000 per violation, and attorneys' fees under 15 U.S.C.

§ 1692e.

288.  As a result of these violations, Plaintiff is entitled to actual damages, statutory damages up to $1,000 per violation, and attorneys' fees under Fla. Stat. § 559.77(2).

**COUNT XIX**
**USURY / UNLAWFUL INTEREST**
**FLA. STAT. § 687.02 ET SEQ. (AND/OR APPLICABLE STATE LAW)**
(AGAINST SUPERFAST CAPITAL INC., ALTERNATIVE CAPITAL GROUP LLC, TOP CHOICE FINANCIAL INC., SUPERVEST, INC., SV CAPITAL MANAGEMENT LLC, EZ ADVANCE LLC, AND GABRIEL SHAMUELOV)

289.  Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

290.  As alleged above, notwithstanding its "Revenue Purchase Agreement" label, the transaction at issue functioned in substance as a loan, not a true sale of future receivables. The Agreement obligated MedTech to repay a fixed amount of approximately $109,500 on a funded amount of approximately $75,000 over a fixed 44 week schedule, with no genuine transfer of risk of non collection to Defendants and no operative reconciliation mechanism.

291.  The economic reality of the transaction, including (a) fixed, scheduled weekly debits regardless of actual receivables, (b) a blanket UCC 1 lien filed by SuperFast Capital, Inc. against "ALL" of MedTech's present and after acquired assets, and (c) Defendants' post notice insistence on full repayment and threat of legal action, demonstrates that Defendants were extending, and collecting on, a loan of money to Plaintiff.

292.  When the fixed payback amount is compared to the net funds actually received over the contracted 44 week term, the effective annualized rate of

interest far exceeds the maximum rates permitted under Florida's usury statutes, including Fla. Stat. §§ 687.02–687.04, and, to the extent New York law applies through any choice of law clause, exceeds New York's criminal usury thresholds as well.

293.   Defendants SuperFast Capital Inc., Alternative Capital Group LLC, Top Choice Financial Inc., Supervest, Inc., SV Capital Management LLC, EZ Advance LLC, and Gabriel Shamuelov, directly or through their joint enterprise structure, knowingly contracted for, charged, and received interest on the loan in excess of the legal maximums applicable to such commercial loans.

294.   Defendants were sophisticated commercial finance actors with actual knowledge of applicable interest rate limits and the usury laws of Florida and New York, and nevertheless structured and enforced the transaction to extract an unlawful rate of return from Plaintiff.

295.   Defendants' conduct in designing, funding, syndicating, servicing, and collecting this loan at a usurious rate was willful and intentional within the meaning of Fla. Stat. ch. 687 and applicable usury law, and not the product of mistake or inadvertence.

296.   Furthermore, the contract was not able to be adjusted due to reconciliation of Plaintiff's actual receivables. The email address provided on the Agreement which would allow Plaintiff to request reconciliation is a non-functioning email with an inactive domain. When Plaintiff attempted to communicate with the Defendants through the email provided in the Agreement for reconciliation of receivables, the email was returned undeliverable.

297.   As a direct and proximate result of Defendants' unlawful imposition and collection of usurious interest, Plaintiff has suffered damages including, but not limited to, (a) payment of interest and charges in excess of lawful limits, (b) loss

of use of funds paid under the usurious loan, and (c) consequential operational and business damages.

298.   Under Fla. Stat. § 687.04 and other applicable law, Plaintiff is entitled to relief including, without limitation, forfeiture and recovery of all interest paid or contracted to be paid in excess of the lawful rate, cancellation of any obligation to pay further unlawful interest, and such additional statutory penalties and remedies as the Court deems just and proper.

299.   To the extent the debt constitutes an "unlawful debt" within the meaning of 18 U.S.C. § 1961(6) and analogous state provisions, Plaintiff further alleges that Defendants' making and collection of such unlawful debt provides an additional, independent basis for relief and for characterization of the transaction as void, voidable, and unenforceable as a matter of public policy.

300.   Plaintiff seeks compensatory, statutory, and exemplary relief as permitted by law, together with attorneys' fees and costs where authorized.

**COUNT XX**
**ABUSE OF PROCESS**
**FLA. LAW**
(AGAINST SUPERFAST CAPITAL INC., ALTERNATIVE CAPITAL GROUP LLC, TOP CHOICE FINANCIAL INC., CURE PAYMENT RECOVERY SOLUTIONS LLC, SUPERVEST, INC., AND SV CAPITAL MANAGEMENT LLC)

301.   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

302.   On or about February 21, 2025, SuperFast Capital, Inc., acting within and on behalf of the Super Top Defendants and their unified enterprise, caused a Florida UCC 1 Financing Statement (No. 202500452261) to be filed naming SuperFast as secured party and purporting to encumber "ALL" of Plaintiff's

present and after acquired assets, despite SuperFast not being a party to the Agreement and never receiving any grant of security interest from Plaintiff.

303.   The UCC 1 was facially improper and unauthorized, including because (a) the purported filer, Joseph Vaknen, was deceased at the time of filing, and (b) no security agreement or other authorization naming SuperFast as secured party existed.

304.   Thereafter, SuperFast, together with Alternative Capital Group LLC, Top Choice Financial Inc., Cure Payment Recovery Solutions LLC, Supervest, Inc., and SV Capital Management LLC, maintained, relied upon, and invoked the UCC 1 filing as legal process to coerce Plaintiff's continued payments and to threaten enforcement actions, even after receiving written and oral notice that the transaction had been procured by fraud and that the addendum was "not from us" and "is fraud."

305.   Defendants used the UCC system and the recorded financing statement not for its proper, lawful purpose of reflecting a legitimately granted security interest, but primarily to obtain collateral advantages unrelated to any valid lien—namely, to (a) pressure Plaintiff to continue making weekly payments on a fraud induced loan, (b) block Plaintiff's access to alternative financing, and (c) create leverage in any dispute by clouding title to all of Plaintiff's business assets.

306.   Defendants further weaponized the UCC 1 filing by threatening that any interference with their collection efforts would constitute an "Event of Default" triggering legal action, thereby using the existence of the recorded lien and the specter of enforcement proceedings to extract payment and discourage Plaintiff from contesting the underlying fraud.

307.   The filing, maintenance, and threatened enforcement of the unauthorized

UCC 1 financing statement constituted an abuse of process under Florida law, in that Defendants used formal legal process (the UCC recording system and lien enforcement mechanisms) primarily to accomplish purposes for which the process was not designed and to extort performance on a contract procured by fraud.

308.  As a direct and proximate result of Defendants' abuse of process, Plaintiff has suffered damages including, but not limited to, (a) impaired title to its assets, (b) denial and loss of access to needed working capital financing, (c) reputational and credit harm, and (d) fees, costs, and business disruption associated with addressing and attempting to remove the unauthorized filing.

309.  When Plaintiff sought additional credit from another loan company he was denied as a result of this fraudulent UCC-1 filing.

310.  Defendants' conduct was willful, malicious, and in reckless disregard of Plaintiff's rights, justifying an award of compensatory and punitive damages, as well as injunctive and declaratory relief terminating and barring any further use or reliance on the unauthorized UCC 1.

## **REQUEST FOR RELIEF**

WHEREFORE, the Plaintiff, MT Products LLC d/b/a MedTech., respectfully requests that this Honorable Court grant it the following relief:

A) **Declaratory & Rescissory Relief:**

1. Declare the Revenue Purchase Agreement void, voidable, and/or rescinded at Plaintiff's election;

2. Declare that SuperFast Capital Inc. holds no authorized security interest in Plaintiff's assets and that the Florida UCC-1 naming

SuperFast is unauthorized and ineffective; and

3. Declare that Defendants have no present right to debit, collect, or enforce against Plaintiff based on the challenged transaction.

B) **Injunctive Relief (temporary, preliminary, and permanent):**

1. Enjoin Defendants (and those in active concert with them) from initiating, processing, causing, or attempting any ACH debits, setoffs, or other collections from Plaintiff;

2. Enjoin Defendants from using, maintaining, enforcing, communicating, or relying upon the UCC-1, and order filing of a termination statement (and any conforming amendments);

3. Enjoin Defendants from engaging in any further debt collection activities in Florida without proper licensing;

4. Enjoin any interference with Plaintiff's vendor, banking, or credit relationships arising from the disputed agreement or lien; and

5. Order evidence preservation (including DocuSign envelopes/audit logs, call audio/transcripts, emails/SMS, ACH files, servicing notes, UCC instructions, and ISO onboarding records).

C) **Damages:**

1. Compensatory damages for all losses proximately caused by Defendants' conduct, including monies withdrawn by weekly ACH debits, loss of use of funds, credit/operational impairment tied to the unauthorized lien, loss of funding opportunities, investigation costs, and other consequential damages;

2. Treble damages under Fla. Stat. § 772.104 (Florida Civil RICO) and 18 U.S.C. § 1964(c);

3.  Actual damages under Fla. Stat. § 679.625 for the unauthorized UCC filing and its maintenance;

4.  Actual and statutory damages under the Fair Debt Collection Practices Act (up to $1,000) for unlawful debt collection practices;

5.  Actual and statutory damages under the Florida Consumer Collection Practices Act (up to $1,000 per violation) for unlicensed debt collection;

6.  Actual damages for FDUTPA violations under Fla. Stat. § 501.211(2);

7.  Conversion damages equal to all specifically identifiable ACH withdrawals taken after Defendants had actual notice, claw-back of commissions; plus loss-of-use damages.

D)  **Restitution / Disgorgement / Constructive Trust:** Restitution and disgorgement of amounts wrongfully collected (including sums routed downstream to investors/affiliates), and imposition of a constructive trust over such proceeds until repaid.

E)  **Punitive Damages:** Punitive damages on the intentional torts (including fraud, conspiracy, aiding-and-abetting, and conversion) to punish and deter similar misconduct.

F)  **Fees & Costs:** Attorneys' fees and costs under all applicable statutes, including Fla. Stat. § 772.104 (Florida Civil RICO), Fla. Stat. § 501.2105 (FDUTPA), N.Y. Gen. Bus. Law § 349(h), 18 U.S.C. § 1964(c), and as otherwise permitted by law or contract; together with taxable costs and expert fees to the extent allowed.

G)  **Interest:** Pre- and post-judgment interest at the maximum rates permitted by Florida law, including from the date of each wrongful debit for conversion-based amounts.

H) **Further Relief:** Such other and further legal and equitable relief (including accounting and any ancillary orders necessary to effectuate lien termination and restitution) as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial on all issues so triable pursuant to Fed. R. Civ. P. 38 and the 7th Amendment to the United States Constitution.

Dated: January 23, 2026                    Respectfully Submitted,
New York, New York


PRINCILIS LAW FIRM
By:
/s/ Anthony Moser
 Anthony V. Moser
amoser@princilislaw.com
14 NE 1st Ave, Suite
1402 Miami, FL 33132
(786) 845- 6967
Attorneys for Plaintiff


IGBOKWE PLLC
By:
O. Williams Igbokwe (5170683)
*Attorney for Plaintiff*
28 Liberty Street, 6th Floor
New York, NY 10005
Tel: (347) 467- 4674
Fax: (347) 467-6367
will@iwlaws.com
Attorneys for Plaintiff

*Pro Hac Vice*