**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MT PRODUCTS LLC d/b/a MEDTECH,

Plaintiff,

Case No. 8:25-cv-02510-WFJ-SPF

v.

ALTERNATIVE CAPITAL GROUP, LLC; SUPERFAST CAPITAL, INC.; TOP CHOICE FINANCIAL, INC.; CURE PAYMENT RECOVERY SOLUTIONS, LLC; SUPERVEST, INC.; SV CAPITAL MANAGEMENT, LLC; EZ ADVANCE LLC; GABRIEL SHAMUELOV a/k/a “Matt Owens” and “Jason Caldwell”; and DOES 1–10,

Defendants.
_______________________________________/

**SECOND AMENDED COMPLAINT JURY TRIAL DEMANDED**

Plaintiff MT Products LLC d/b/a MedTech, by its undersigned counsel, for its Second Amended Complaint against Defendants alleges as follows. This pleading is filed under the Court’s order of July 28, 2026 (Doc. 60) and Plaintiff’s pending motion for relief from the dismissal (Doc. 68). It pleads eight causes of action, each drawn from the twenty pleaded in the First Amended Complaint. No count incorporates any other count. Each count incorporates only the factual allegations of the section titled Facts, by paragraph number.

## PRELIMINARY STATEMENT

1. This is an action for fraud, civil conspiracy, violation of the Racketeer Influenced and Corrupt Organizations Act, violation of the Florida Deceptive and Unfair Trade Practices Act, the filing of an unauthorized financing statement, and usury. Plaintiff MT Products LLC d/b/a MedTech ("MedTech"), a Florida small business, seeks relief against a New York merchant cash advance operation and the broker that supplied it with merchants.

2. In January and February 2025, Defendant Gabriel Shamuelov, using the false names "Matt Owens" and "Andrew," solicited MedTech's owner, Leandro Obenauer, by text message and telephone, held himself out as a lender, and induced MedTech to sign a $75,000 revenue purchase agreement by sending Mr. Obenauer a forged addendum on the letterhead of the funder, "SuperFast Cap," promising $450,000 in further funding without underwriting.

3. The forged addendum was signed for the funder by "Jason Caldwell." The DocuSign record shows that the "Jason Caldwell" account was created on Shamuelov's own email address six days before it was used.

4. The funder, Defendant Alternative Capital Group, LLC, doing business as SuperFast Cap, through its servicing agent Defendant Top Choice Financial, wired $73,255 to MedTech in Florida, filed a financing statement against MedTech in the Florida Secured Transaction Registry in the name of an

entity that does not exist, and began debiting MedTech's Florida bank account $2,488.64 every week.

5. When Mr. Obenauer discovered the fraud in April 2025, the funder's own merchant-support personnel wrote that the addendum "is not from us. That is fraud." The funder's representative then wrote that the broker had "used our name and branding without our consent," offered to unwind the transaction only if MedTech returned the entire advance within six days, and threatened default fees and suit if MedTech blocked collection.

6. The obligation the funder has collected carries a rate of return above 58 percent per annum by simple computation and above 100 percent per annum when each weekly remittance is treated as a payment of principal and interest, more than twice the rate enforceable under the law of Florida or of New York.

**PARTIES**

7. Plaintiff MT Products LLC is a Florida limited liability company doing business as MedTech. At all times alleged herein, MedTech's principal place of business was in Leesburg, Lake County, Florida.

8. Leandro Obenauer ("Mr. Obenauer") is MedTech's owner and president. Mr. Obenauer signed the agreement at issue as MedTech's owner and as guarantor. Mr. Obenauer is not a party to this pleading.

9. At all times alleged herein, Defendant Alternative Capital Group, LLC ("ACG") was a New York limited liability company. ACG is the "FUNDER" named in the agreement at issue. ACG does business as "SuperFast Cap" and "Superfastcap" through the domain superfastcap.com.

10. Defendant SuperFast Capital, Inc. is the name in which the financing statement against MedTech was filed. No entity by that name is registered in Florida. The New York Department of State lists only a "SuperFast Capital LLC," formed in 2019. (Exhibit H.) MedTech refers to Defendant SuperFast Capital, Inc., SuperFast Capital LLC, and the SuperFast Cap brand together as "SuperFast."

11. At all times alleged herein, Defendant Top Choice Financial, Inc., also identified in the agreement and on MedTech's bank statements as Top Choice Financial LLC ("Top Choice"), was a New York entity. The agreement names Top Choice "the Authorized Sub-Servicing Agent and the General Agent of the Purchaser." Top Choice wired the advance to MedTech and originates every debit from MedTech's account.

12. At all times alleged herein, Defendant Supervest, Inc. ("Supervest") was a New York corporation. The agreement directs MedTech's remittance-adjustment requests to admin@supervestcap.com. Supervest shares its New York addresses with Top Choice. On information and belief, Supervest supplied the

capital for the advance through a syndicate of its investors and receives the proceeds of the debits.

13. At all times alleged herein, Defendant SV Capital Management, LLC ("SV Capital") was a New York limited liability company affiliated with Supervest. On information and belief, SV Capital manages the Supervest syndicate through which the advance was funded.

14. At all times alleged herein, Defendant Cure Payment Recovery Solutions, LLC ("Cure") was a New York limited liability company. Cure answers the SuperFast telephone number listed in the agreement. The agreement directs MedTech's reconciliation requests to superfastmerchantsupport@curepayment.com. Cure's personnel conducted the funding call and the merchant-support correspondence described below in the name of SuperFast.

15. At all times alleged herein, Defendant EZ Advance LLC ("EZ Advance") was a New York limited liability company with addresses at 18032 Union Turnpike, Fresh Meadows, New York 11366 and 10827 66th Avenue, Forest Hills, New York 11375. EZ Advance's website holds it out as a direct lender. The website reproduces text and logos copied from the website of Rapid Finance, an established funder. SuperFast identified EZ Advance as the "broker of record" on MedTech's transaction.

16. Defendant Gabriel Shamuelov ("Shamuelov") is an individual residing at 63-109 Saunders Street, Apt. A13, Rego Park, New York 11374. Shamuelov controls EZ Advance's email account matt@ezadvancellc.com. Shamuelov conducted the transaction with MedTech under the names "Matt Owens" and "Andrew," using telephone numbers (786) 952-6979, (347) 933-7764, and (516) 689-1420. The (347) 933-7764 number is registered to Shamuelov. On information and belief, Shamuelov also used the name "Jason Caldwell," which appears on the forged addendum and on the DocuSign account that sent it from Shamuelov's email address. Every reference below to "Matt Owens," "Owens," "Andrew," or "Jason Caldwell" is a reference to Shamuelov acting under that name.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because Counts IV and V arise under the Racketeer Influenced and Corrupt Organizations Act, and under 28 U.S.C. § 1367(a) because the remaining counts arise from the same transaction.

18. ACG, and through ACG its agents SuperFast and Top Choice, consented to this Court's jurisdiction. Section 4.5 of the agreement provides that any proceeding arising from it may be brought, "if FUNDER so elects," in any court sitting in New York or Florida, that all parties submit to the jurisdiction of

those courts, and that they waive "any and all objections to jurisdiction or venue."

19. Each Defendant is subject to personal jurisdiction in Florida under Fla. Stat. § 48.193(1)(a)(1) and (2) and consistent with due process, on the facts pleaded below and in particular the following. Shamuelov and EZ Advance solicited MedTech in Florida by text message beginning January 2, 2025, communicated with Mr. Obenauer in Florida by text, telephone, email, and DocuSign through April 2025, and transmitted the forged addendum into Florida. Each of those communications was a tortious act committed in Florida.

20. ACG, SuperFast, Top Choice, and Supervest contracted with a Florida merchant, wired funds to MedTech's Florida bank account, debited that account weekly for nearly seven months, filed a financing statement in the Florida Secured Transaction Registry against MedTech and its Florida assets, and sent demands and threats into Florida. Cure conducted the funding call with Mr. Obenauer in Florida, corresponded with MedTech in Florida, and demanded payment from MedTech in Florida after Cure knew the transaction was procured by fraud.

21. Shamuelov committed the intentional torts alleged here in his own name and under aliases of his own invention, aimed at a Florida business, with injury suffered in Florida. The acts were Shamuelov's own, not merely his

company's. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred here, and under 18 U.S.C. § 1965(a) and (b).

## STATEMENT OF FACTS

**MEDTECH**

22. MedTech sells medical supplies and emergency kits to institutional customers from Leesburg, Florida. In early 2025 MedTech was growing and needed working capital for inventory and marketing. Before February 2025 MedTech had never taken a merchant cash advance.

**JANUARY 2025: SHAMUELOV SOLICITS MEDTECH AS "MATT OWENS"**

23. On January 2, 2025, Mr. Obenauer received an unsolicited text message on his cellular telephone in Florida from (786) 952-6979. The message offered "funding" and was signed "Matt Owens." The person sending the message was Shamuelov.

24. On January 30, 2025, Shamuelov, as "Matt Owens," sent a second unsolicited message from the same number. Between January 31 and February 3, 2025, Shamuelov asked Mr. Obenauer for MedTech's bank statements, a voided check, and Mr. Obenauer's driver's license. Mr. Obenauer provided them.

**FEBRUARY 3, 2025: THE CHECKOUT LINK AND THE ADDENDUM**

25. On February 3, 2025, Shamuelov told Mr. Obenauer that he had "another number" and moved the conversation to (347) 933-7764.

26. The same day, Shamuelov sent Mr. Obenauer a link to "SuperfastCap - Instant Checkout" at superfastcap.com and wrote: "Please complete the link to enter the checkout process to receive Contracts." The same day, Shamuelov wrote: "I have also sent over an addendum for you sign from my legal counsel via docusign."

**FEBRUARY 3 THROUGH 11, 2025: THE REPRESENTATIONS**

27. Between February 3 and February 11, 2025, by text message, voice message, and telephone into Florida, Shamuelov made the following representations to Mr. Obenauer.

28. Shamuelov represented that he was a lender. Shamuelov wrote "we as a lender" and referred to "my underwriters," "my legal counsel," "my accounting department," "my funding manager," "my investors," and "my credit committee." Shamuelov represented that the lender was SuperFast Cap.

29. Shamuelov represented that the total cost of the $75,000 advance would be "15% on the interest in total."

30. Shamuelov represented that the advance was the first of three pre-approved fundings: $75,000 immediately, $150,000 on May 12, 2025, and $300,000

on January 12, 2026, the second and third to be extended "without requiring additional underwriting or credit review."

31. Shamuelov represented that the addendum setting out those terms came from the lender's legal counsel and that a colleague named "Jason" would send it.

32. On February 7, 2025, after Mr. Obenauer asked for the underlying contract, Shamuelov wrote that "due to legal reasons, I cannot view or access it until it is signed by you," and that he would "have Jason resend it now."

33. Shamuelov told Mr. Obenauer that his name was Andrew. In two voice messages on February 10 and 11, 2025, Mr. Obenauer addressed Shamuelov as "Andrew."

34. Each representation in paragraphs 28 through 33 was false when made, and Shamuelov knew it was false.

35. EZ Advance was not a lender. EZ Advance was a broker. SuperFast identified EZ Advance as the "broker of record." SuperFast had no employee named "Jason Caldwell" and none named "Matt Owens." SuperFast's personnel later wrote that both "are not employed with SuperFast Cap."

36. There were no pre-approved second and third fundings. SuperFast later wrote that the addendum "was typed up fraudulently," and SuperFast's representative wrote that the broker "fabricated non-existent post-funding

options that were never available to you." The cost of the advance was not 15 percent. The agreement required repayment of $109,500 on $73,255 received.

**FEBRUARY 10, 2025: THE FORGED ADDENDUM**

37. The DocuSign account used to send the addendum was in the name "Jason Caldwell" on the email address Matt@ezadvancellc.com, Shamuelov's address at EZ Advance. The account's electronic record and signature disclosure bears a creation date of February 4, 2025.

38. On February 10, 2025, at 5:31 p.m. Pacific time, that account sent Mr. Obenauer a DocuSign envelope titled "SUPERFAST CAP ADDENDUM AGREEMENT," containing a file named "Untitled document (7).pdf," from IP address 96.250.50.213, a Verizon static address assigned in New York. The document (the "Addendum") bears the SuperFast Cap logo. The Addendum is titled "Addendum to the Funding Agreement." The Addendum names "SUPERFAST CAP" as "Lender" and Leandro Obenauer as "Merchant." The Addendum is dated February 10, 2025.

39. Section 1 of the Addendum states an initial funding of $75,000 over 44 weeks at $2,488.63 per week with "early payoff discounts." Sections 2 through 4 of the Addendum state a second funding of $150,000 on May 12, 2025 and a third of $300,000 on January 12, 2026, each "pre-approved" and extended

"without requiring additional underwriting or credit review," on terms that "will remain unchanged, regardless of the Merchant's financial standing."

40. The Addendum is signed for "SUPERFAST CAP" by "Jason Caldwell," "Authorized Representative." Mr. Obenauer signed the Addendum by DocuSign at 8:09 p.m. Pacific time on February 10, 2025, from Florida. The DocuSign certificate of completion identifies the envelope originator as "Jason Caldwell," email Matt@ezadvancellc.com. The completion notice to Mr. Obenauer was sent "Reply-To: Jason Caldwell <Matt@ezadvancellc.com>."

41. No one named Jason Caldwell was authorized to sign for SuperFast. SuperFast's representative later wrote that the broker "used our name and branding without our consent." A true copy of the Addendum is attached as Exhibit A. A true copy of the DocuSign certificate of completion is attached as Exhibit B.

**FEBRUARY 11, 2025: THE FUNDING CALL**

42. On February 11, 2025, SuperFast, through Cure, required Mr. Obenauer to complete a recorded "funding call" before the advance would be released. That morning Shamuelov sent Mr. Obenauer a voice message instructing Mr. Obenauer how to handle the call. Shamuelov said that "one of my new accountants" would conduct the call.

43. Shamuelov said: "Regarding the other deals, don't mention it to them, to the accountant. It's between me and my funding manager and the investors." Shamuelov then wrote: "Again, as I mentioned, this funding call is for the 75,000. If you have any other questions about the other deals, let me know the accountant does not have any idea about them so I don't wanna confuse him so please don't mention it to him."

44. Shamuelov gave Mr. Obenauer the number (516) 246-6315 for the call. Mr. Obenauer made the call. The SuperFast representative asked Mr. Obenauer whether he had been promised additional funding. Following Shamuelov's instruction, and believing the Addendum to be a lender document the representative was not cleared to discuss, Mr. Obenauer said no.

45. Immediately after the call Mr. Obenauer wrote to Shamuelov: "Just to confirm that addendum is full in force? Just the way she was talking she was making it sound like I gotta pay back all 110k." Shamuelov replied: "Yes of course, they are legally binded together. She is just saying that because she needs to, because that is the payback if you decided not to refinance."

46. SuperFast recorded the funding call. SuperFast's representative later invoked the recording against MedTech, writing that it is "extremely important to be truthful on the recorded funding call about promises the broker may have

made." True copies of the text messages between Mr. Obenauer and Shamuelov of February 3 through February 11, 2025 are attached as Exhibit C.

**FEBRUARY 11, 2025: THE AGREEMENT**

47. On February 11, 2025, MedTech signed a "Revenue Purchase Agreement" with ACG by DocuSign, together with its security agreement and guaranty of performance (the "Agreement"). Mr. Obenauer signed as MedTech's owner and as guarantor. A true copy is attached as Exhibit D.

48. The Agreement is on a form headed "Revenue Based Factoring (RBF/ACH) Agreement." The Agreement states ACG's address as 85 Delancey Street, New York, New York 10002 and ACG's telephone number as (866) 355-2140. The Agreement states a "Purchase Price" of $75,000, a "Purchased Amount" of $109,500, a "Purchased Percent" of 15%, and a weekly "Remittance" of $2,488.64.

49. Section 1.3 of the Agreement permits reconciliation only on written request to superfastmerchantsupport@curepayment.com, accompanied by every bank statement, processing statement, and receivables report since the date of the Agreement, and provides that if MedTech declines to give ACG bank login access "FUNDER shall have no obligation to reconcile."

50. Section 1.4 of the Agreement permits a remittance adjustment only on written request to admin@supervestcap.com on the same conditions. That

address was not on a working domain. MedTech's email to it requesting an adjustment of the remittance was returned as undeliverable.

51. The Agreement provides that upon any Event of Default "the Purchased Percentage shall equal 100%." Section 3.1 of the Agreement defines Events of Default to include entering into any other financing, failing to produce bank login information within two business days of a request, and the bank returning any code other than NSF.

52. Section 1.11 of the Agreement appoints ACG as MedTech's attorney-in-fact. "Protection 3" of the Agreement authorizes ACG to execute a confession of judgment in MedTech's name and enter it "with the Clerk of any Court." Appendix A of the Agreement imposes a $1,500 origination fee, a $39.95 monthly servicing fee, a $2,500 fee if MedTech blocks a debit, a default fee of $2,500 or 25 percent of the balance, and a "stacking fee." The Guaranty of Performance provides that the guarantor is "jointly and severally liable for all amounts owed to FUNDER in the Event of Default."

53. Section 4.5 of the Agreement provides that the Agreement is governed by New York law and that proceedings may be brought, at ACG's election, in any court sitting in New York or Florida. The Disbursement Authorization in the Agreement names "Top Choice Financial, Inc." as "the Authorized Sub-Servicing Agent and the General Agent of the Purchaser," which

"will initiate all debits and credits to Seller's account, provide customer service and administrative support," and "initiate any necessary collection actions." The Disbursement Authorization states a "Net Amount Deposited" of $73,255.00.

54. The Agreement contains no reference to a second or third funding, to pre-approval, or to the Addendum. When Mr. Obenauer noticed that the prepayment terms in the Agreement differed from the Addendum, Shamuelov wrote: "It's just a standard template. Not all the people get the addendum. We don't have it in the contracts because if someone decides to run with our money there's no way they can get the rest of the money." No one gave MedTech any written disclosure that EZ Advance was a broker or that EZ Advance would be paid a commission.

55. MedTech signed the Agreement because of the Addendum. MedTech would not have accepted a $109,500 obligation on $73,255 for a single advance.

**FEBRUARY 12, 2025: TOP CHOICE WIRES THE ADVANCE**

56. On February 12, 2025, $73,255.00 was credited to MedTech's account at JPMorgan Chase in Florida by Fedwire, "B/O: Top Choice Financial LLC New York," through Old National Bank. The difference between $75,000 and $73,255 is the $1,500 origination fee, the wire fee, and other charges under Appendix A.

**FEBRUARY 21, 2025: THE FINANCING STATEMENT**

57. On February 21, 2025, at 2:56 p.m., a UCC-1 financing statement was filed against MedTech in the Florida Secured Transaction Registry, filing number 202500452261. A true copy is attached as Exhibit E.

58. The financing statement names as secured party "SUPERFAST CAPITAL, INC.," 85 Delancey Street, The Yard #33 – Joseph Vaknen, New York, New York 10002. The financing statement names MedTech and Mr. Obenauer as debtors and describes the collateral as all of MedTech's tangible and intangible assets "pursuant to the Revenue Purchase Agreement."

59. The financing statement was filed through Corporation Service Company under filer reference 3053 20623.

60. No entity named SuperFast Capital, Inc. is registered in Florida or, on information and belief, in New York. SuperFast Capital, Inc. is not a party to the Agreement. The Agreement names ACG as funder and Top Choice as servicer. The Agreement authorizes ACG to file financing statements. The Agreement does not authorize any filing in the name of SuperFast Capital, Inc.

61. Joseph Vaknen founded SuperFast. On information and belief, Joseph Vaknen died before February 21, 2025.

**FEBRUARY 25–SEPTEMBER 15, 2025: THE DEBITS**

62. The first scheduled debit failed because the originator identification Shamuelov gave Mr. Obenauer for MedTech's bank was wrong. On February 25, 2025, two debits of $2,488.64 each posted to MedTech's account. Each bears the originator name "Top Choice Finan," originator ID 1861890123, and the descriptor "Superfast." From March 4, 2025 through August 18, 2025, Top Choice debited $2,488.64 from MedTech's account each week under the same originator name, ID, and descriptor. Top Choice also debited $39.95 from MedTech's account each month under the same originator name and the descriptor "Superfast."

63. On August 19, 2025, MedTech told Cure that it could not cover a pending debit. Cure replied: "Unfortunately, the payment is already pending. DO NOT STOP the payment. LET IT BOUNCE. The NSF fee is thousands of dollars less than the stop payment fee." On August 25, 2025, the weekly debit was reduced to $1,244.32.

64. In total, Top Choice debited approximately $71,000 from MedTech's Florida account in weekly remittances and monthly servicing fees. On information and belief, Top Choice remitted the debits to Supervest and its syndicate, with Top Choice, SuperFast, and ACG retaining fees.

**MARCH AND APRIL 2025: THE PROMISED SECOND FUNDING**

65. Through March and into April 2025, Shamuelov continued to assure Mr. Obenauer by text message that the second funding would be released once 30 percent of the first had been repaid. No second funding was released. Between April 5 and April 15, 2025, Shamuelov stopped answering Mr. Obenauer's calls, text messages, and emails.

**APRIL 15–17, 2025: SUPERFAST DISCLAIMS THE ADDENDUM**

66. On April 15, 2025, Mr. Obenauer called the SuperFast number in the Agreement, (866) 355-2140. The call was answered by SuperFast merchant support at Cure.

67. The same day, Elisa L. of "SUPERFAST CAP Merchant Support," writing from superfastmerchantsupport@curepayment.com, confirmed that MedTech had "a loan with them for $75,000" that was "legitimate and still active," and sent Mr. Obenauer a copy of the Agreement titled "MT PRODUCTS LLC- Superfast Cap contract.pdf." The same day, after reviewing the Addendum that Mr. Obenauer forwarded, Elisa L. wrote: "The addendum you have is not from us. That is fraud."

68. On April 16, 2025, Elisa L. wrote that "Matt Owens" and "Jason Caldwell" "are not employed with SuperFast Cap" and that the Addendum "was typed up fraudulently." The same day, Lauren Esposito, Director, writing

from the same Cure address, wrote that EZ Advance was the "broker of record," that "Matt Owens" was "the rep who submitted and worked the deal," and that the application had been "submitted by email."

69. On April 17, 2025, SuperFast, through Cure, offered MedTech a "payment reprieve" and wrote that "Management has also offered to allow you to return the funds of $50,857.40 to resolve the balance. Current balance is $87,141.24." True copies of the SuperFast emails of April 15 through April 17, 2025 are attached as Exhibit F.

**APRIL 18–24, 2025: THE DEMANDS AND BALDWIN'S RESPONSE**

70. On April 18, 2025, MedTech sent a demand by Priority Mail Express to "Superfast Capital c/o Joseph Vaknen" at the address on the financing statement. The United States Postal Service returned the demand on April 29, 2025 marked "Return to Sender – Unable to Forward." Beginning April 18, 2025, MedTech sent written demands to ACG, SuperFast, Top Choice, Cure, EZ Advance, and Shamuelov describing the forgery and demanding rescission, release of the financing statement, and cessation of collection.

71. Cure received its demand on April 23, 2025. SuperFast received its demand at its Department of State address on April 23, 2025. Top Choice received its demand at 61 Broadway, Suite 1901 on May 7, 2025. The demand to ACG at 85 Delancey Street was refused. The demands to EZ Advance at both of

its addresses were returned. The demand to Shamuelov at his Booth Street address was returned unclaimed. On April 24, 2025, Andrew Baldwin, writing from andrew@superfastcap.com and signing as "Superfastcap / Alternative Capital Group LLC," responded for ACG and SuperFast. A true copy is attached as Exhibit G.

72. Baldwin wrote that "EZ Advance fabricated non-existent post-funding options that were never available to you." Baldwin wrote that EZ Advance "acted outside the scope of their authority, used our name and branding without our consent, and in doing so, misled both you and our organization." Baldwin wrote that ACG and SuperFast would "allow you to rescind the advance in full by returning the total amount disbursed to you (minus what you've already paid)" by April 30, 2025, and that "Upon receipt of full repayment, we will immediately release the UCC lien filed on your business."

73. Baldwin wrote: "Should you choose to block or interfere with our continued attempts to collect under the terms of the agreement, such action would constitute an Event of Default as outlined in your contract. This would trigger additional default-related fees and may result in legal action to enforce the terms of the agreement." Baldwin wrote that it is "extremely important to be

truthful on the recorded funding call about promises the broker may have made."

74. MedTech could not return $50,857.40 within six days. MedTech had spent the advance in reliance on the promised second funding. Collection continued after April 24, 2025. Top Choice kept debiting MedTech's account through September 15, 2025.

75. On April 28, 2025, the Florida Secured Transaction Registry rejected, for a $12 fee, an information statement Mr. Obenauer had submitted under Fla. Stat. § 679.518 stating that SuperFast Capital, Inc. was not a party to the Agreement and was not entitled to file. The financing statement remains of record. The same day, MedTech replied to Baldwin that Mr. Obenauer's answers on the funding call had been given under Shamuelov's coaching and that SuperFast's own process had enabled the fraud. No one responded.

**MAY 2025: THE SUPERVEST ADMISSIONS**

76. On May 6, 2025, an investigator retained by MedTech reached Shamuelov, who confirmed the Rego Park address stated above. On May 12 and 13, 2025, Mr. Obenauer spoke by telephone with a representative of Top Choice, reached through the number published on Top Choice's website, (609) 553-9092, who identified herself as Nicole Orme. Nicole Orme said that she was aware of

MedTech's case and asked whether Mr. Obenauer was "building a RICO investigation," although MedTech's demands had not mentioned RICO.

77. Nicole Orme said: "I technically work for Supervest. Top Choice is a processor. So when I say 'us' it could mean any of the three of us." Nicole Orme said that MedTech's advance was funded through a syndication involving Supervest, with disbursement and repayment processed by Top Choice. Nicole Orme said that ACG was "on paper for protection" and that she did not know what else ACG did.

78. Nicole Orme said that SuperFast licenses Top Choice's underwriting system, that Joseph Vaknen had been involved in both SuperFast and Top Choice and had died, and that SuperFast-branded transactions appear as "Top Choice Financial" on merchants' bank statements because Top Choice processes them. Nicole Orme said that EZ Advance had submitted about ten other deals to SuperFast. Nicole Orme said that SuperFast had received complaints on EZ Advance's other deals describing the same promised follow-on funding and the same coaching of funding calls.

79. Nicole Orme said that a commission of approximately $7,500 to $10,000 had been paid to EZ Advance on MedTech's transaction. Nicole Orme said that Supervest had clawed the commission back after learning of the fraud and that MedTech received no credit for it.

80. Nicole Orme said that no cancellation could occur without full repayment of principal because of "Supervest's investor structure." Nicole Orme said that it was common and known for brokers to use aliases in dealing with SuperFast, and that SuperFast had no record of Gabriel Shamuelov, only of "Matt Owens." Nicole Orme said that a third party handled broker background checks and that she had never reviewed EZ Advance's website.

81. Nicole Orme said that principals of Supervest, Top Choice, ACG, and SuperFast had met to discuss MedTech's demand letters and had approved Andrew Baldwin's April 24, 2025 response before it was sent.

**SEPTEMBER 2025: THE END OF PAYMENTS AND THIS ACTION**

82. MedTech made every payment after April 24, 2025 under the threat in Baldwin's letter, under the Agreement's $2,500 blocked-debit fee, its default fee, its conversion of the purchased percentage to 100 percent, and its confession-of-judgment authorization, and under protest. MedTech made no payment after September 15, 2025. MedTech commenced this action on September 17, 2025. Mr. Obenauer decided to stop the debits when MedTech commenced this action.

**THE SUPERFAST ENTERPRISE**

83. ACG, SuperFast, Top Choice, Supervest, SV Capital, Cure, EZ Advance, and Shamuelov together constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "SuperFast Enterprise").

84. The SuperFast Enterprise has a common purpose: to originate, fund, document, collect, and enforce high-cost cash advances to small businesses under the SuperFast brand. The SuperFast Enterprise has a structure. SuperFast is the brand and the point of contact. ACG is the contracting party. Top Choice is the disbursing and collecting agent and licenses the underwriting system. Supervest and SV Capital supply the capital and receive the returns. Cure conducts funding calls, answers the SuperFast telephone number, handles merchant support, and collects. EZ Advance and Shamuelov originate the merchants.

85. The SuperFast Enterprise has longevity. Joseph Vaknen founded SuperFast and was involved in Top Choice. SuperFast Capital LLC was formed in 2019. Top Choice and Supervest share two addresses. The SuperFast telephone number rings at Cure. The Agreement names Cure's and Supervest's email addresses. The SuperFast Enterprise is engaged in interstate commerce. The SuperFast Enterprise solicits merchants in Florida and other states from New York, wires funds across state lines, and debits bank accounts across state lines. Each Defendant is a person within 18 U.S.C. § 1961(3) distinct from the SuperFast Enterprise, and each conducted or participated in the conduct of the enterprise's affairs.

86. The SuperFast Enterprise is in the business of lending money. Persons speaking for SuperFast have stated that SuperFast works with

"thousands of brokers" and pays brokers commissions of 10 to 12 percent on funded deals. SuperFast's representative stated that EZ Advance alone submitted about ten deals. Shamuelov spoke of "our money" placed with other merchants and sent Mr. Obenauer another merchant's debit record.

**THE RATE**

87. The Agreement required MedTech to repay $109,500 on $73,255 received over 44 weeks. The excess of $36,245 over 44 weeks is a return of 49.5 percent for the period and 58.5 percent per annum by simple computation.

88. When each weekly remittance is treated as a payment of principal and interest, the rate is 1.94 percent per week, 100.7 percent per annum nominal, and 171 percent per annum compounded. The Agreement's fixed weekly remittance, its fixed 44-week term, its conditional and nullifiable reconciliation, routed to an address that did not work, its conversion of the purchased percentage to 100 percent on default, its default fee, and its guaranty of "all amounts owed" on default together make repayment absolute. The transaction is a loan.

89. The maximum lawful rate of interest in Florida is 18 percent per annum simple interest under Fla. Stat. § 687.02, and interest above 25 percent is criminal under Fla. Stat. § 687.071. The criminal usury rate in New York is 25 percent per annum under N.Y. Penal Law § 190.40. The rate on MedTech's

obligation exceeds twice the enforceable rate under the law of either state. The obligation is an unlawful debt within 18 U.S.C. § 1961(6).

**DAMAGES**

90. MedTech paid interest on the obligation at the rate pleaded above, the $1,500 origination fee, and the monthly servicing fees of $39.95. MedTech lost the use of the funds debited from its operating account every week for nearly seven months.

91. MedTech incurred costs of investigation, including investigators, record searches, process service, and travel to New York. MedTech's operations were disrupted. MedTech planned inventory, marketing, and sales on the promised second and third fundings, which did not exist. MedTech was required to notify its vendors of payment delays in April and May 2025.

92. The financing statement clouds MedTech's title to all of its assets in favor of an entity that does not exist. A lender declined MedTech credit because of the financing statement.

**COUNT I — FRAUDULENT INDUCEMENT (Against Shamuelov, EZ Advance, ACG, SuperFast, and Top Choice)**

93. Plaintiff realleges paragraphs 1 through 92 as if set forth in full.

94. Shamuelov, acting for himself and for EZ Advance, made the representations in paragraphs 28 through 33 to Mr. Obenauer and transmitted the Addendum described in paragraphs 37 through 41.

95. Each representation was a statement of existing fact. Each was false. Shamuelov knew each was false when made and made it to induce Plaintiff to sign the Agreement. MedTech, through Mr. Obenauer, relied on the representations and on the Addendum. MedTech signed the Agreement, authorized the debits, and provided its bank and identity information because of them. MedTech's reliance was justified. The Addendum bore SuperFast's logo, came through SuperFast's own checkout process, and was followed by a funding call from SuperFast's own personnel.

96. ACG, SuperFast, and Top Choice are liable for the representations because Shamuelov and EZ Advance acted with their apparent authority. ACG, SuperFast, and Top Choice accepted the application Shamuelov submitted, dealt with EZ Advance as broker of record, conducted the funding call Shamuelov arranged, funded the transaction Shamuelov originated, paid EZ Advance a commission, and permitted Shamuelov to use the SuperFast name and checkout link.

97. ACG, SuperFast, and Top Choice are also liable because they ratified the fraud. After April 15, 2025 they knew the Addendum was forged and the

application was procured by a false identity, and, after the broker's commission was clawed back without credit to MedTech, they elected to keep the transaction, keep the financing statement, continue the debits, and threaten default.

98. As between MedTech and ACG, SuperFast, and Top Choice, it was those Defendants that selected EZ Advance, permitted EZ Advance to use the SuperFast name and checkout link, and did not verify who was behind EZ Advance.

99. Plaintiff has been damaged in an amount to be proven at trial. In the alternative, Plaintiff is entitled to rescission of the Agreement and restitution of all amounts paid in excess of the amount received. Plaintiff offers to restore any amount found due to Defendants upon rescission.

100. Shamuelov's conduct was intentional and warrants punitive damages under Fla. Stat. § 768.72.

**COUNT II — AIDING AND ABETTING FRAUD (Against ACG, SuperFast, Top Choice, Supervest, SV Capital Management, and Cure)**

101. Plaintiff realleges paragraphs 1 through 92 as if set forth in full.

102. Shamuelov and EZ Advance defrauded Plaintiff by the forged Addendum and the false representations of identity, cost, and future funding. ACG, SuperFast, Top Choice, and Cure had actual knowledge of that fraud no later than April 24, 2025. Their own personnel wrote that the Addendum "is not

from us. That is fraud," that it "was typed up fraudulently," and that the broker "fabricated non-existent post-funding options." Supervest and SV Capital Management had actual knowledge no later than May 12, 2025, when Nicole Orme discussed the fraud and the clawback of the broker's commission with Plaintiff's principal, and earlier, when Supervest clawed back the commission.

103. With that knowledge, each substantially assisted the fraud in achieving its object, which was the collection of $109,500 from Plaintiff on a transaction Plaintiff would not have entered. Top Choice continued to debit Plaintiff's account through September 15, 2025. ACG and SuperFast maintained the financing statement, conditioned its release on full repayment, and threatened default fees and suit if collection was blocked. Cure continued to service the account and to communicate demands and balances to Plaintiff. Supervest and SV Capital Management continued to receive the proceeds of the debits and refused cancellation because of "Supervest's investor structure."

104. Plaintiff has been damaged in an amount to be proven at trial.

**COUNT III — CIVIL CONSPIRACY (Against All Defendants)**

105. Plaintiff realleges paragraphs 1 through 92 as if set forth in full.

106. Defendants agreed among themselves to originate, document, fund, and collect the obligation described above by the means described above. Shamuelov and EZ Advance agreed to originate the merchant by whatever

representations were necessary. ACG, SuperFast, Top Choice, Supervest, SV Capital Management, and Cure agreed to fund and collect on whatever the broker originated, to keep the proceeds after learning how the merchant had been originated, and to use the financing statement, the default provisions, and the recorded funding call to prevent the merchant from unwinding the transaction.

107. Each Defendant committed overt acts in furtherance of the agreement, including those described in paragraphs 1 through 92.

108. The underlying wrongs are the fraudulent inducement of the Agreement by the forged Addendum and the false representations of identity, cost, and future funding, and the collection of a debt at more than twice the rate enforceable under the law of Florida and the law of New York. In the alternative to the allegation that Defendants together constitute a single enterprise, Defendants acted as independent entities who agreed to accomplish those wrongs together.

109. Plaintiff has been damaged in an amount to be proven at trial.

**COUNT IV — VIOLATION OF 18 U.S.C. § 1962(c) (Against All Defendants)**

110. Plaintiff realleges paragraphs 1 through 92 as if set forth in full.

111. The SuperFast Enterprise is an enterprise within 18 U.S.C. § 1961(4) engaged in and affecting interstate commerce. Each Defendant is a person within

18 U.S.C. § 1961(3) and is distinct from the SuperFast Enterprise. Each Defendant conducted or participated, directly or indirectly, in the conduct of the SuperFast Enterprise's affairs through the collection of an unlawful debt within 18 U.S.C. § 1961(6).

112. Plaintiff's obligation under the Agreement is a debt incurred in connection with the business of lending money at a rate usurious under the law of Florida and the law of New York, where the rate is at least twice the enforceable rate. Shamuelov and EZ Advance originated the debt. ACG and SuperFast documented and own it. Top Choice disbursed it and collects it. Supervest and SV Capital Management funded it and receive its proceeds. Cure services and collects it. Each thereby participated in the collection of the unlawful debt.

113. In the alternative, each Defendant conducted or participated in the conduct of the SuperFast Enterprise's affairs through a pattern of racketeering activity consisting of wire fraud in violation of 18 U.S.C. § 1343. In furtherance of a scheme to obtain MedTech's money and property by false pretenses, the following interstate wires were sent from New York into Florida: Shamuelov's text messages to Mr. Obenauer of January 2, January 30, and February 3 through February 11, 2025, carrying the checkout link and the false representations of identity, cost, and future funding; the DocuSign transmission of the forged

Addendum on February 10, 2025; Shamuelov's voice message of February 11, 2025 coaching the funding call; the funding call of February 11, 2025; the Fedwire of February 12, 2025; the Cure and Baldwin emails of April 17 and April 24, 2025 conditioning rescission and threatening default; and each weekly ACH debit by Top Choice from February 25 through September 15, 2025.

114. Those wires were related, continued for eight months, and were the enterprise's regular way of doing business with Plaintiff and, on information and belief, with other merchants originated by EZ Advance and other brokers.

115. Plaintiff was injured in its business and property by reason of the violation, in the amounts debited above the funds received, the interest and fees paid on the unlawful debt, the loss of use of its operating funds, the costs of investigation, and the cloud on its assets. Plaintiff is entitled to threefold its damages, costs, and reasonable attorney's fees under 18 U.S.C. § 1964(c).

**COUNT V — RICO CONSPIRACY, 18 U.S.C. § 1962(d) (Against All Defendants)**

116. Plaintiff realleges paragraphs 1 through 92 as if set forth in full.

117. Each Defendant agreed that the SuperFast Enterprise would collect from Plaintiff a debt incurred in the business of lending money at more than twice the rate enforceable under the law of Florida and the law of New York, and, in the alternative, agreed to the scheme to obtain Plaintiff's money and

property by false pretenses carried out through interstate wires from New York into Florida between January 2 and September 15, 2025. Each Defendant knew of and agreed to the overall objective of the SuperFast Enterprise, which was to fund and collect advances at the rates described above, and agreed to perform its role in originating, documenting, funding, disbursing, servicing, or collecting Plaintiff's obligation.

118. Each Defendant took the acts attributed to it above in furtherance of that agreement. Plaintiff was injured in its business and property by reason of the conspiracy and is entitled to threefold its damages, costs, and reasonable attorney's fees under 18 U.S.C. § 1964(c).

**COUNT VI — FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Against All Defendants)**

119. Plaintiff realleges paragraphs 1 through 92 as if set forth in full.

120. Each Defendant engaged in trade or commerce in Florida within Fla. Stat. § 501.203(8). Shamuelov and EZ Advance engaged in deceptive acts by holding EZ Advance out as a lender, inventing "Jason Caldwell," forging the Addendum, misrepresenting the cost and structure of the advance, and coaching Plaintiff's principal to deceive the funder's own personnel.

121. ACG, SuperFast, Top Choice, Supervest, SV Capital Management, and Cure engaged in unfair acts by funding and collecting a transaction they

knew by April 2025 to have been procured by forgery, by conditioning rescission on the return of the full advance within six days, by threatening default fees and suit if collection was blocked, by maintaining a financing statement in the name of a non-existent entity, by instructing Plaintiff to let a debit bounce rather than stop it, and by collecting at the rate described above.

122. Those acts offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to merchants. The policy of Florida against them is expressed in Fla. Stat. § 687.02, § 687.071, § 679.509, and § 559.9611 et seq. Plaintiff suffered actual damages, including the amounts debited above the funds received, the amounts debited after April 24, 2025, and the fees charged.

123. Plaintiff is entitled to actual damages, attorney's fees, and costs under Fla. Stat. § 501.211(2) and § 501.2105. Plaintiff is also entitled under Fla. Stat. § 501.211(1) to a declaration that the Agreement was procured by the deceptive acts described above and to an injunction directing ACG and SuperFast to terminate the financing statement, barring further debits from Plaintiff's accounts, and barring any use of the confession-of-judgment authorization and the power of attorney in the Agreement.

**COUNT VII — UNAUTHORIZED FINANCING STATEMENT, Fla. Stat. § 679.625 (Against SuperFast, ACG, and Top Choice)**

124. Plaintiff realleges paragraphs 1 through 92 as if set forth in full.

125. Under Fla. Stat. § 679.509(1), a person may file an initial financing statement only if the debtor has authorized the filing in an authenticated record or by authenticating a security agreement. Plaintiff authenticated a security agreement in favor of ACG. Plaintiff did not authorize any filing by or in favor of SuperFast Capital, Inc.

126. The financing statement filed on February 21, 2025 names SuperFast Capital, Inc. as secured party. SuperFast Capital, Inc. is not the secured party under the Agreement and, on information and belief, does not exist. On information and belief, the filing was ordered by ACG or Top Choice, which held the Agreement and chose to file in SuperFast Capital, Inc.'s name with Joseph Vaknen as contact. The filing was unauthorized under Fla. Stat. § 679.509.

127. Plaintiff is entitled under Fla. Stat. § 679.625(2) to damages for the loss caused by the filing and under Fla. Stat. § 679.625(5) to $500 from each person that filed a record it was not entitled to file. Plaintiff is also entitled to a declaration that the financing statement is ineffective and to an order directing its termination, and, if the secured party of record fails to file a termination

statement within twenty days of demand as required by Fla. Stat. § 679.513, to the remedies that section provides.

**COUNT VIII — USURY, Fla. Stat. ch. 687, and in the Alternative New York Law (Against ACG, SuperFast, Top Choice, Supervest, and SV Capital Management)**

128. Plaintiff realleges paragraphs 1 through 92 as if set forth in full.

129. The Agreement is a loan. Repayment of $109,500 on $73,255 was absolute, on a fixed weekly schedule, over a fixed term, secured by all of Plaintiff's assets and by a guaranty of all amounts owed on default, with reconciliation conditioned on terms the funder could nullify and routed to an address that did not work.

130. The rate of interest exceeds 18 percent per annum and exceeds 25 percent per annum. ACG, SuperFast, Top Choice, Supervest, and SV Capital Management willfully charged, reserved, and took that interest. Each knew the terms of the Agreement and the amount advanced.

131. Under Fla. Stat. § 687.04, those Defendants have forfeited the entire interest charged and are liable to Plaintiff for double the amount of interest taken. Under Fla. Stat. § 687.071(7), no extension of credit made at a rate above 25 percent per annum is an enforceable debt in the courts of Florida.

132. In the alternative, if New York law governs under Section 4.5 of the Agreement, the Agreement is void under N.Y. General Obligations Law § 5-521(3) and N.Y. Penal Law § 190.40 because the rate exceeds 25 percent per annum, and Plaintiff is entitled to a declaration to that effect and to restitution of all sums paid in excess of the amount received. Plaintiff has been damaged in the amount of the interest taken, to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MT Products LLC d/b/a MedTech demands judgment against Defendants as follows.

On Counts I, II, III, and VIII, compensatory damages in an amount to be proven at trial, and on Count VIII double the interest taken under Fla. Stat. § 687.04. On Counts IV and V, threefold the damages sustained, costs, and reasonable attorney's fees under 18 U.S.C. § 1964(c).

On Count VI, actual damages, attorney's fees, and costs under Fla. Stat. § 501.211 and § 501.2105, a declaration that the Agreement was procured by deceptive acts, and an injunction directing termination of financing statement number 202500452261, barring further debits from Plaintiff's accounts, and barring any use of the confession-of-judgment authorization and the power of attorney in the Agreement. On Count VII, statutory damages of $500 against each

filer, actual damages, and an order declaring the financing statement ineffective and directing its termination.

On Count I in the alternative and on Count VIII, rescission of the Agreement and restitution of all amounts paid in excess of the amount received. Punitive damages against Shamuelov under Fla. Stat. § 768.72. Prejudgment interest, costs, and such other relief as the Court deems just.

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues so triable. The jury waiver in Section 4.10 of the Agreement was procured by the fraud alleged above and is unenforceable.

Dated: October 24, 2026

Respectfully submitted,

PRINCILIS LAW FIRM
/s/ Anthony V. Moser
Anthony V. Moser
Florida Bar No. 1034553
14 NE 1st Avenue, Suite 1402
Miami, Florida 33132
(786) 845-6967
amoser@princilislaw.com

IGBOKWE PLLC
O. Williams Igbokwe (admitted pro hac vice)
One World Trade Center, 85th Floor
New York, New York 10007

(347) 467-4674
will@iwlaws.com

Counsel for Plaintiff